Raymond A. O'Connor and Bertha K. O'Connor v. Commissioner. Burt Cold Storage, Inc. v. Commissioner.
O'Connor v. Commissioner
Docket Nos. 38396, 38512.
United States Tax Court
T.C. Memo 1967-174; 1967 Tax Ct. Memo LEXIS 86; 26 T.C.M. (CCH) 820; T.C.M. (RIA) 67174; August 25, 1967
L. Robert Leisner, for the petitioners. Ira L. Tilzer and Wallace Musoff, for the respondent. *88 WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in income tax and additions to tax of the petitioners for the following years and in the amounts indicated: Raymond A. O'Connor and Bertha K. O'Connor
Docket No. 38396
Income Tax
Additions to tax
I.R.C. 1939
Sec.
Year
Deficiency
Sec. 293(b)
294(d)(2)
1943
$ 14,690.56
$ 7,921.66
1944
17,981.54
9,056.68
$ 801.71
1945
40,113.81
20,397.27
2,109.14
1946
109,273.23
55,567.37
6,259.94
1947
17,149.19
8,574.59
596.95
1948
23,641.07
11,820.54
986.46
1949
10,745.22
5,372.61
252.12
Burt Cold Storage, Inc.
Docket No. 38512
Income Tax
Additions to tax
FYE
I.R.C. 1939
June 30
Deficiency
Sec. 291(a)
Sec. 293(b)
1942
$ 3,298.79
$ 1,649.40
1943
1,250.00
$ 312.50
625.00
1944
1,921.04
480.26
960.52
1945
2,600.00
650.00
1,300.00
1946
5,203.20
1,300.80
2,601.60
1947
52.01
13.01
26.01
1948
7,573.98
1,893.50
3,786.99
1949
636.46
159.12
318.23
Declared Value Excess Profits Tax
1942
$ 2,233.05
$ 1,116.53
1943
10,108.54
$ 2,527.14
5,054.27
1944
$ 13,666.78
$ 3,416.70
$ 6,833.39
1945
9,144.14
2,286.04
4,572.07
Excess Profits Tax
1942
$ 5,264.71
$ 1,316.18
$ 2,632.36
1943
60,013.87
15,003.47
30,006.94
1944
80,907.66
20,226.92
40,453.83
1945
47,537.10
11,884.28
23,768.55
1946
8,172.61
2,043.15
4,086.30
*89 Issues presented for determination are the correctness of the respondent's action as follows: In the case of Raymond A. O'Connor and Bertha K. O'Connor Docket No. 38396 (1) In determining that petitioners filed joint income tax returns for 1943 through 1949, (2) in failing to determine that assessment and collection of the deficiencies in tax and additions to tax for 1943 through 1946 are barred under section 3631 of the Internal Revenue Code of 1939[1] as a result of respondent's violation of the provisions of that section, (3) in failing to determine that certain evidence obtained by respondent's special agent, George Montz, during the period August 2, 1950, to the end of that year should be suppressed, (4) in the use by respondent of the net worth and expenditures method in determining the unreported income of the petitioners for 1943 through 1949, (5) in determining that the petitioners were liable for 1943 through 1949 for additions to tax for fraud under section 293(b) of the Code, (6) in failing to determine that assessment of the deficiencies in income tax for 1943 through 1946 is barred under the provisions of section 275(a) of the Code, (7) in failing to determine *90 that assessment of the deficiencies in income tax for 1943 through 1945 is barred under the provisions of section 275(c) of the Code, and (8) in determining that for 1944 through 1949 the petitioners were liable under section 294(d)(2) of the Code for additions to tax for substantial underestimation of estimated tax. In the Case of Burt Cold Storage, Inc Docket No. 38512 (1) In determining that for the taxable year ended June 30, 1942, the petitioner had additional income as receipts of $22,196.34 and unallowable deductions for purchases of $18,000 and for bad debts of $37,090.12. (2) In determining that for the following taxable years ended June 30, the petitioner had business income in the indicated amounts which it did not report for income tax purposes: Year
Amount
1943
$ 76,579.84
1944
103,536.22
1945
69,273.75
1946
28,961.39
1947
247.68
1948
32,083.19
1949
3,662.23
(3) In determining that for the taxable years ended June 30, 1942, through June 30, 1949, the petitioner was liable for additions to tax under section 293(b) of the *91 Code for fraud. (4) In determining that for the taxable years ended June 30, 1942, through June 30, 1946, the petitioner was liable for additions to tax under section 291(a) of the Code for failure to file excess profits tax returns. (5) In determining that for the taxable years ended June 30, 1943, through June 30, 1945, the petitioner was liable for additions to tax under section 291(a) of the Code for failure to file declared value excess profits tax returns. (6) In determining that petitioner was liable for deficiencies in income taxes, declared value income taxes, and excess profits taxes and additions to tax when there has been no corporate activity on the part of petitioner since June 30, 1942. Raymond A. O'Connor and Bertha K. O'Connor Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, Raymond A. O'Connor, sometimes hereinafter referred to as Raymond, and petitioner, Bertha K. O'Connor, sometimes hereinafter referred to as Bertha, are husband and wife and during the taxable years 1943 through 1949 resided in Niagara Falls, New York. The petitioners have four children, namely, Thomas, John, Catherine, and Vivian. *92 The joint Federal income tax returns of the petitioners were filed with the collector of internal revenue, 28th district of New York, Buffalo, New York, for the following years on the indicated dates: Year
Date filed
1943
March 15, 1944
1944
March 15, 1945
1945
February 15, 1946
1946
March 5, 1947
1947
March 5, 1948
1948
February 25, 1949
1949
March 15, 1950 The returns for the years 1943 through 1948 were captioned "R. A. O'Connor" and the return for 1949 was captioned "Raymond A. O'Connor." The returns for all of the years were signed by Raymond and the return for 1948 also was signed by Bertha. Bertha did not file a separate income tax return for any of the years 1943 through 1949. On October 18, 1951, the respondent mailed to Raymond and Bertha a joint statutory notice of deficiency wherein he determined the deficiencies in income tax and additions to tax for the years in issue here on the basis that the returns for such years were their joint returns. The above-mentioned individual income tax returns for 1943 through 1949 were intended by Raymond and Bertha to be and were their joint income tax returns for the respective years. Consequently *93 the returns sometimes hereinafter will be referred to as the petitioners' returns or the returns of the petitioners. Since at least 1922, Raymond's primary occupation has been that of accountant and certified public accountant. In 1922 he began as his own business the practice of accounting in Niagara Falls, New York. In 1923 he admitted his brother Julian J. O'Connor into the accounting business as a partner with him and they thereafter conducted the business under the name of R. A. O'Connor & Company. Subsequently and in 1938, Jackson A. Lyon was admitted to membership in the partnership with them. In 1932 Raymond was certified by the Regents of the State of New York as a certified public accountant. Raymond in the conduct of his partnership accounting business handled income tax cases and negotiations with the then Bureau of Internal Revenue for a period of more than 20 years, including cases involving respondent's Intelligence Division, and he has represented hundreds of taxpayers. He was admitted to practice before the Tax Court and he has represented petitioners before that Court. In the course of his accounting practice and as a certified public accountant, Raymond received *94 and subscribed to various tax services, professional journals, and similar reading material in order to keep current his knowledge of taxation and accounting. He was qualified as an expert witness in the field of income tax law and accounting by his attorney during the trial of the instant cases and testified as an expert witness. Raymond also had been previously qualified as an expert witness by his attorney in the second trial of an indictment against him in the United States District Court for the Western District of New York during the period April 2, 1957, to June 3, 1957, and as an expert witness his testimony covered, among others, the subjects of net worth, cash versus accrual method of accounting, depreciation, casualty losses, partnership returns, and the doctrine of constructive receipt of income. Bertha held real properties in her sole name, known as 31 Niagara Street, the Wheatfield Farm, the Youngstown Farm, Ferry Street, and 9013 South Military Road, during all or part of the years 1943 through 1949. Raymond furnished all or practically all of the funds involved in the acquisition of those properties. Income and deductions pertaining to the foregoing properties were *95 reported and claimed on each of the income tax returns of the petitioners for each of the years 1943 through 1949 during the periods the properties were held in the name of Bertha. Although the Wheatfield Farm was held in the name of Bertha during the entire period 1943 through 1949, farm losses pertaining to that property were claimed on the foregoing returns for each of the years in issue. As early as 1936 and after the Wheatfield Farm had been placed in her name, Bertha and Raymond went to the farm regularly during a period of 2 months and engaged in planting about 3,600 elm and poplar trees on approximately 53 acres of the farm. Although during the years in issue Bertha never personally operated the farms standing in her name, she was generally familiar with the facts relating to their requirements for labor and financial outlays. Following the advent of World War II Raymond and Bertha obtained a series of unsatisfactory farm managers. From some of the real properties standing in her name Bertha personally collected and retained the rents. Bertha received during the years in issue the real property tax bills from the county and the city or township in which the real properties *96 standing in her name were situated. After these bills had been paid they were retained by her for an unspecified period or periods and then destroyed. During the years here involved, Bertha was familiar with the personnel and the changes therein of the office force of Raymond's accounting partnership. In these years when Bertha received dividends or interest, she deposited them in her bank account or spent them. During the years in issue Raymond deposited in the bank accounts of his children annually sums of money from his income, and he also deposited in the bank account of Bertha each year approximately $3,000 of money from his income. Bertha was aware of the source and purpose of the deposits made annually by Raymond to her account and the extent that such deposits were reported currently as income. During 1948 Bertha made individual contributions to churches, the Community Chest, or other charitable organizations but no such contributions were taken as deductions in the return of the petitioners for that year. Julian J. O'Connor, brother of Raymond A. O'Connor, was an active member of the accounting partnership of R. A. O'Connor & Company from 1923 until some time in the *97 1950's, except for the period of time he was on active duty with the United States Navy during the years 1943, 1944, and 1945. After Julian J. O'Connor went into the Navy, Raymond no longer maintained a cash journal or a general ledger for the accounting partnership of R. A. O'Connor & Company. He kept only accounts receivable books and checkbooks and he did not have an accounts receivable ledger sheet for each client. Partnership receipts of R. A. O'Connor & Company could not be determined from the accounts receivable ledger sheets of the partnership during the years 1945 through 1949. Some of the partnership receipts were not recorded in the accounts receivable ledger, nor were some otherwise recorded on the partnership books when received. Unrecorded fees amounted to $8,671.98 in 1947 and $11,600.10 in 1948. Raymond specifically admitted under oath that checks of Chisholm-Ryder of Pa. and Ruhlman Brothers Hardware Co., Inc., for accounting services rendered were not reflected in the partnership accounts receivable ledger. Raymond failed to deposit partnership fees in the partnership bank account maintained for R. A. O'Connor & Company and gross partnership receipts could not *98 be determined from bank deposits. No determination of the gross income of R. A. O'Connor & Company could have been made from the partnership books and records themselves. During the course of the investigation of the petitioners' income tax liabilities for the years in issue, Raymond refused to show to respondent's agent, Richard Wetzel, a list of accounts from the accounts receivable ledger of R. A. O'Connor & Company, and Wetzel did not see the accounts receivable ledger. Raymond threw away partnership records of R. A. O'Connor & Company for 1946 and prior years, including accounts receivable records, his personal records, and records of Burt Cold Storage, Inc. Partnership records and his personal records are not all available for the years 1947 through 1949. Raymond's stated policy with regard to records was that he did not keep business records after they were audited by the Internal Revenue Service, or, in any event, later than 3 years. Indicative of Raymond's attitude toward record keeping were his responses under oath that instead of a written record, he "would keep a mental note" of important and substantial financial transactions. During the hearing, he, in the main, *99 was unable to produce either documents or records that were contemporaneously made, or books and records kept in the ordinary course of business, to substantiate his alleged financial transactions. Raymond never produced any books of account covering the years 1943 through 1946 for examination by respondent's representatives during the investigation of the income tax liabilities of the petitioners here in issue for those years, nor were such records inspected or examined by respondent's representatives in ascertaining the deficiencies in tax for such years. Raymond never objected to any inquiry or examination made by respondent's representatives prior to respondent's determination of the deficiencies in tax and additions to tax here in issue on the ground that such inquiry or examination constituted a second or additional inspection of petitioners' books. Raymond made use of large amounts of currency to effect his financial transactions and deposited substantial amounts of currency to his bank accounts. He cashed checks representing fees of R. A. O'Connor & Company, delayed and withheld the deposit of fees, and purchased bank checks and bank drafts with currency, in substantial *100 amounts, which he held for long periods of time. At the end of the year Raymond gave to his brother, Julian J. O'Connor, cash which he told Julian represented Julian's share of the proceeds of the checks representing fees of R. A. O'Connor & Company, which had been cashed by Raymond. During the years 1945 through 1949 bank drafts and official checks were purchased in favor of Raymond personally in an amount totaling in excess of $41,000. During the years 1948 and 1949 bank drafts and official checks were purchased in favor of R. A. O'Connor & Company in the respective total amounts of $17,710.80 and $11,910.80 and were equally distributed between Raymond and his brother Julian. During the years 1943, 1944, and 1945, while Julian O'Connor was in the Navy, Raymond, as owner of 100 percent of the assets and the income thereof, continued the operation of the accounting business under the name of R. A. O'Connor & Company. During the years 1946 through 1949, after Julian's return to active participation in R. A. O'Connor & Company, the ownership of assets and the division of income of that partnership were considered by them to be 50 percent to Julian and 50 percent to Raymond. Undeposited *101 fees and checks received by R. A. O'Connor & Company during the years 1944, 1945, 1946, 1947, 1948, and 1949 amounted to $3,800, $24,791.33, $6,436.17, $7,606.73, $10,529, and $4,488.75, respectively. Raymond personally received 100 percent of the foregoing amounts for the years 1944 and 1945 while his brother Julian was in the Navy and 50 percent for the years 1946, 1947, 1948, and 1949. R. A. O'Connor & Company filed its Federal partnership returns of income for each of the taxable years 1944 through 1949 with the collector of internal revenue, 28th district, Buffalo, N. Y., on the following respective dates: March 15, 1945, February 19, 1946, March 15, 1947, March 6, 1948, February 28, 1949, and March 15, 1950. The partnership returns were signed by Raymond and show Jackson A. Lyon as a member of the partnership during each of the years 1944 through 1946 but not a member during the years 1947 through 1949. During the years 1947 through 1949, the only partners of R. A. O'Connor & Company were Raymond and his brother, Julian J. O'Connor. Jackson A. Lyon died in February 1951 after a long illness. The only payments made during the years 1947 through 1949 by Raymond A. O'Connor & *102 Company to Lyon were those reflected in the checkbook of R. A. O'Connor & Company. Raymond and Bertha did not report interest income earned on their savings bank accounts during any of the years 1944 through 1949, although they maintained a total of at least 14 separate known savings bank accounts during that period. The interest income earned on savings bank accounts, and thus omitted by the petitioners from the income tax returns for the foregoing years, was as follows: Year
Amount
1944
$ 269.59
1945
495.30
1946
447.83
1947
509.48
1948
850.47
1949
1,638.73
Other interest income received by Raymond and Bertha during the years 1944 through 1947 but which was not reported on the returns of the petitioners arose from a contract entered into by Raymond, on November 13, 1944, with Leonard B. and Stella M. Sirgey for the sale of land, which sale was finally consummated in December 1947. The omitted interest income from the Sirgey transaction was as follows: Year
Amount
1944
$ 7.81
1945
180.60
1946
143.10
1947
97.18
Raymond, in explanation of the admitted failure to report bank interest, advanced a theory which he termed "Net of *103 Other Income." He described this theory as an approved accounting procedure involving the mental offset of deductions against income thereby reporting only the difference on an income tax return. He concluded that under his "Net of Other Income" theory if deductions equaled or exceeded gross income, regardless of amount, it would not be necessary to file an income tax return. Raymond's "Net of Other Income" theory was employed in the preparation of the income tax returns of the petitioners at least for the years 1944 through 1949. As a consequence interest income they received was not reported on their returns but deductions for interest were taken on the returns. During the indicated years dividends in the following amounts were paid on common stock of Maid of the Mist Corporation which stock was issued to Raymond and held in his name: Year
Amount
1943
$ 72
1944
144
1945
180
1946
432
1947
288
1948
360
1949
360
Although the dividend checks of Maid of the Mist Corporation were payable to Raymond and in some instances the amounts thereof were deposited in his personal account, the petitioners did not report these dividends on their income tax returns *104 for any of such years. Raymond, in explanation of the petitioners' omission of the Maid of the Mist dividend income from their returns, stated that the stock certificates belonged to his children and that he turned the dividends over to them. However, none of his children ever reported the receipt of these Maid of the Mist dividends on their returns. Raymond owned 450 shares of common stock of Cataract Theatre Corporation which he acquired in his name in 1938 and which he subsequently sold to Richard A. Hayman during December 1945 for $4,500. In 1946 Raymond received a dividend check of $2,137.50 which represented the sum total of the dividends accumulated on that stock for the years 1943, 1944, and 1945. The check in the amount of $2,137.50 was issued from the dividend account and checkbook of the Cataract Theatre Corporation and the petitioners admittedly failed to report the receipt of this amount on their 1946 income tax return. On February 12, 1946, Raymond leased the premises of a canning plant owned by him to American Home Foods, Inc. The lease extended from March 1, 1946, to February 28, 1947, and provided for an annual rent of $8,000 to be paid to him in 12 equal monthly *105 installments beginning on March 1, 1946. Raymond requested American Home Foods, Inc., to defer after April 1, 1946, the making of any rent payments pursuant to the lease. On October 28, 1946, American Home Foods wrote to Raymond stating that it desired to enter the rent charges as an expense on its books during the year 1946 and that it would "therefore appreciate it if you will let us know the latest date before December 31, 1946 on which we can send you our check." On November 12, 1946, Raymond responded to the corporation's request by writing that he desired to procure on December 31, 1946, payment for the balance of the rent due under the lease and asked that payment of the balance, $7,333.33, be made by four checks, in equal amounts, drawn payable, respectively, to each of his four children, Thomas, John, Catherine, and Vivian. American Home Foods complied with his request and, on December 31, 1946, forwarded checks of $1,833.33 payable to each of Raymond's four children. The rent of $7,333.33 from American Home Foods was not reported by the petitioners on their 1946 income tax return although Raymond has testified that this amount did represent rent to him and was taxable *106 to him in 1946. In July 1948, Raymond received a check for $600 from Wilson Canning Co. in part payment for the sale of cherries. This check was cashed and the proceeds were admittedly not reported by the petitioners on their 1948 return although the balance of the payment for the cherries from Wilson Canning Co. of $2,935.36, made in August 1948, was reported. Raymond purchased 100 shares of Skelly Oil Company stock in 1927 for $3,400. The stock remained in his name from 1927 until May 1948. During that period, dividends were paid to Raymond who considered the stock as his property. In May 1948, the Skelly Oil Company stock, together with 11 shares of Mission Corporation stock which had been acquired by Raymond in 1935 at no cost, was sold for $15,887.14. The resulting gain of $12,487.14 was not reported by the petitioners on their 1948 return. The certificates of Skelly Oil Company stock and of the Mission Corporation stock bore an assignment by endorsement on the backs of the certificates to Bertha from Raymond under date of May 21, 1948. The trade date of the sale of the stocks was May 22, 1948. The proceeds of the sale of the stocks were used, in part, to purchase Gulf Oil *107 stock in the name of Bertha and the balance remained in a bank account in her name. In May 1948, at the time the Skelly Oil and the Mission Corporation stocks were sold, the respective ages of petitioners' children were: Vivian
12
Catherine
14
John
16
Thomas
17 John O'Connor and Thomas O'Connor had bank accounts of their own at the time the stocks were sold. The capital gain of $12,487.14, arising from the sale of the Skelly Oil and Mission Corporation stocks, was not only omitted by the petitioners from their 1948 return, but was not reported on any income tax return filed by the petitioners' children. In fact, the transaction was not reported on any return of any kind. At the time of the sale of the Skelly Oil and Mission Corporation stocks they were owned by Raymond and no gift of the certificates of the shares thereof had been made by him to his children prior to such sale. On an undisclosed date or dates prior to July 1945, Raymond acquired 400 shares of stock of Fedders Manufacturing Co. at a basis to him which he estimated was around three or four thousand dollars. During July and August 1945, he sold the 400 shares of stock for a total of $13,896.44. *108 By Raymond's own estimate as to his basis for the stock, a gain of approximately $10,000 resulted from the sale which was not reported by the petitioners on their 1945 return. Nor was the gain which resulted from the sale of the stock reported on any of the income tax returns of the petitioners' children, or in fact on any income tax returns. At the time of the sale of the stock, it was owned by Raymond and no gift of the certificates of the shares thereof had been made by him to his children prior to the sale. In August 1941, Raymond purchased all of the oustanding shares of common stock of Burt Cold Storage, Inc., for the sum of $3,000 which he paid in cash. On May 6, 1946, he drew a check in the amount of $60,000 on the account of Burt Cold Storage, Inc., and deposited it in the bank account of Burt Packing and Warehouse, Inc. On the same date, May 6, 1946, he drew a check for $60,000 on the bank account of Burt Packing and Warehouse, Inc., payable to himself which then was deposited in his special account at the Power City Trust Company. The petitioners did not report in their income tax return for 1946 a resulting gain of $57,000, or any other amount, on the distribution by *109 Burt Cold Storage to its sole stockholder, Raymond. Raymond has testified to the effect that between August 1941 when he acquired the stock of Burt Cold Storage, Inc., and December 1941 he invested an additional $57,000 in cash in Burt Cold Storage, Inc., thus making his total investment in that corporation $60,000 during 1941, that accordingly the distribution to him of $60,000 by Burt Cold Storage, Inc., in May 1946 was, in effect, a return of his investment and that there was, therefore, no gain. The last income tax return filed for Burt Cold Storage, Inc., that for the fiscal year ended June 30, 1942, disclosed in the balance sheet thereon only a loan payable of $3,000. Raymond conceded during the trial herein that his claimed advances to Burt Cold Storage, Inc., of $57,000 were not reflected on that corporation's income tax return for the fiscal year ended June 30, 1942, although he was the sole stockholder of the corporation and its treasurer at the end of 1941 and thereafter. The petitioners purchased a 1941 Oldsmobile in 1941 for the sum of $1,100 and claimed depreciation on that automobile in the amount of $275 during each of the years 1941 through 1944 so that the automobile *110 was fully depreciated at the end of 1944. Although the automobile was fully depreciated, the petitioners continued to claim depreciation on that same automobile in the following amounts: Year
Amount
1945
$275
1946
110
1947
220
1948
220
1949
220
Raymond admitted during the trial that depreciation had been claimed for each of the years 1945 through 1949 on the 1941 Oldsmobile after it had been fully depreciated. In their income tax return for 1949, the petitioners deducted relative to an unspecified structure or building, depreciation in the amount of $1,055.29 with respect to an item designated thereon as, "Office Painting, Supplies, etc.," predicated upon a cost of $8,442.33 in 1948 and a depreciation rate of 25 percent. In the partnership return of income of R. A. O'Connor & Company for 1949, there was deducted relative to an unspecified structure or building, depreciation in the amount of $2,110.58 with respect to an item designated as "Painting, Linoleum" which was predicated upon exactly the same cost as that shown by the petitioners in their individual income tax return, i.e., $8,442.33 in 1948. The painting involved was performed at 31 Niagara Street, *111 a property held in the name of Bertha. The bill for the work involved had been sent to Raymond personally and had been paid by him. The depreciation deductions involved in the individual and partnership returns for 1949 constituted duplicate deductions. The following is a statement of the gross income of the petitioners' four children for each of the years 1944, 1945, 1947, 1948, and 1949: Thomas
Vivian
John
Catherine
Year
O'Connor
O'Connor
O'Connor
O'Connor
1944
$ 946.89
$ 940.02
$ 939.61
$ 940.23
1945
1,006.42
1,000.30
999.94
1,000.49
1947
588.77
543.35
583.03
543.52
1948
1,084.68
886.85
821.47
837.06
1949
1,022.30
1,105.10
1,025.75
1,104.42
Although the gross income of each of the four children of the petitioners for each of the years 1944, 1945, 1947, 1948, and 1949 was in excess of $500, the petitioners claimed dependency exemptions for each of the four children. In their 1949 income tax return petitioners twice claimed the same casualty loss of $3,234 arising from damage by mice to 1,400 trees, once on their "Schedule of Farm Income and Expenses" and once as an itemized deduction. This duplication of deductions *112 was admitted by the petitioners in their verified reply to respondent's amendment to his answer. For years prior to the early part of August 1950, Raymond, R. A. O'Connor & Company, Burt Cold Storage, Inc., and Burt Packing and Warehouse, Inc., maintained their checking accounts at the then Power City Trust Company. In the early part of August 1950 and before the respondent's agents had made an official visit to the Power City Trust Company in connection with the investigation of petitioners' tax liabilities, Raymond visited the home of James F. Brennan, presently an assistant vice president of the Marine Midland Trust Company who then was employed by the Power City Trust Company. After a few minutes of social discourse, Raymond asked Brennan if he could speak to him alone. Brennan's wife, who was present left the room. Raymond then told Brennan that tax men had been in his office on an audit and that he believed that they might come to the bank to subpoena certain records of Burt Packing and Warehouse, or of Burt Cold Storage; that there were certain deposits and withdrawals in the account which apparently should not be there and, in the words of Brennan, that - in order to avoid *113 any embarrassment with the tax men who were making the audit, he asked if I would remove that ledger sheet from the bank records, either displace it or hide it or something so it would not be there. In response, Brennan told Raymond that he could not comply with the request. Thereupon Raymond replied that he would make it worth Brennan's while if he did it. On August 2, 1950, the respondent's special agent, George Montz, sometimes hereinafter referred to as Montz, had his first conference with Raymond, at which time he asked Raymond how many bank accounts were maintained by him and his wife for the years 1947, 1948, and 1949. In response, Raymond mentioned only 5 accounts, all at the Power City Trust Company, although as of December 31, 1949, petitioners had 23 accounts. Raymond did not disclose any of his savings accounts at their first meeting. In December 1950, Montz requested permission to take an inventory of stocks owned by Raymond. In response, Raymond produced stock certificates for an aggregate of 2,600 shares of stock. Raymond actually owned approximately 8,300 shares of stock at that time and he admitted under oath that he did not present all of his stocks to Montz *114 for inventory. During an examination by Montz under oath, Raymond testified as follows: Q#67 You presented approximately 2,600 shares of stocks to be inventoried, and your list of stocks on hand at the end of 1949 shows 8,304 shares. What happened to the difference? A I put the others in a brown envelope in 1946 and gave them to my brother to hold for me while I was in the west, and he returned them when I came back, and since I have moved from the Niagara Building to our present location they have been misplaced. Petitioners had savings accounts and brokerage accounts in localities distant from Niagara Falls and Buffalo. They had nine savings accounts in New York City, one bank account in Hanover, Pennsylvania, and nine brokerage accounts in New York City. Petitioners' New York City bank accounts were utilized by Raymond in the disposition of the $60,000 which he had withdrawn from Burt Cold Storage, Inc., on May 6, 1946, in that he ultimately deposited these funds in such bank accounts rather than in those maintained near his residence. After making an extended and comprehensive investigation as to the income tax liabilities of Raymond and Bertha for the years 1943 through *115 1949, the respondent concluded to and did employ the net worth and expenditures method to determine their unreported income for such years. The factual basis relied upon by respondent in reaching such conclusion included the following: No books of account covering the years 1943 through 1946 had been furnished by petitioners; records essential to the determination of petitioners' income for each of the years 1943 through 1949 either had been destroyed, lost, or thrown away; petitioners' available records for 1947 through 1949, which had been submitted for examination, were inadequate for the determination of income; petitioners' primary source of income consisted of Raymond's share of fees from the R. A. O'Connor & Company accounting partnership and it had been ascertained that substantial amounts of partnership fees had not been deposited in the partnership bank account nor recorded on the partnership books and records; and Raymond had engaged in the use of and deposit of large amounts of currency to effect his financial transactions. The petitioners' bank balances as of December 31 of each of the years 1942 through 1949 were in the total respective amounts of $5,462.28, $17,448.65, *116 $42,115.47, $58,647.38, $150,068.30, $166,914.22, $134,302.26, and $192,911.56. The petitioners' bank drafts and official checks of the Power City Trust Company in favor of Raymond on December 31 of each of the years 1945 through 1949 were in the total respective amounts of $6,704.60, $31,645.93, $31,477.64, $19,321.31, and $9,496.31. The petitioners' 50 percent share of bank drafts and official checks of the Power City Trust Company in favor of R. A. O'Connor & Company on December 31 of each of the years 1948 and 1949 were in the total respective amounts of $8,855.40 and $5,955.40. The petitioners' undeposited fees and checks on December 31 of each of the years 1944 through 1949 were in the total respective amounts of $3,800, $29,291.33, $6,436.17, $10,513.11, $10,529, and $4,488.75. R. A. O'Connor & Company had advanced sums of money to Burt Packing and Warehouse, Inc., and petitioners' 50 percent share of those partnership advances on December 31 of each of the years 1946, 1947, 1948, and 1949 were in the total respective amounts of $6,348.84, $10,864.72, $9,403.14, and $21,036.85. The petitioners advanced $60,000 to Burt Cold Storage, Inc., in 1948, and withdrew $20,000 *117 during that year, thus leaving $40,000 as the amount of their advances as of December 31, 1948. The petitioners owned shares of corporate stock and bonds on December 31 of each of the years 1942 through 1949 in the total respective costs of $105,451.73, $106,501.73, $111,134.48, $132,184.48, $149,419, $161,786.15, $188,848.67, and $206,387.58. The petitioners owned all of the shares of Burt Cold Storage, Inc., for which they had paid $3,000 in August 1941. On December 31 of each of the years 1942, 1943, 1944, and 1945, they held that stock in the total amount of $3,000 on each date. The petitioners owned real estate and equipment on December 31 of each of the years 1942 through 1949 in the total respective costs of $147,850, $147,850, $142,850, $143,100, $139,570, $126,970, $126,595, and $114,636. Petitioners entered into a contract to sell real estate to Leonard B. and Stella Sirgey. The amounts due to petitioners under that contract on December 31 of each of the years 1944, 1945, and 1946 were in the total respective amounts of $3,700, $3,263.41, and $3,001.51. The petitioners had an Oldsmobile automobile on December 31 of each of the years 1942 through 1948 that had cost *118 $1,100; a Mercury automobile on December 31 of each of the years 1946 and 1947 that had cost $1,965; a Chrysler automobile on December 31 of each of the years 1948 and 1949 that had cost $2,995; and a Cadillac utomobile on December 31, 1949, that had an adjusted cost basis of $2,171.55. The petitioners had funds in suspense accounts of the then Bureau of Internal Revenue on December 31 of each of the years 1944 through 1948 in the total respective amounts of $4,751.52, $7,270, $6,720.87, $7,200, and $7,200. The petitioners had a cash surrender value in life insurance on December 31 of each of the years 1942 through 1949 in the total amount of $13,812.91 on each date. The petitioners had a note payable to Adam C. Hayman on December 31 of each of the years 1944 and 1945 in the total amount of $7,500 on each date. The petitioners' reserve for depreciation of buildings and equipment on December 31 of each of the years 1942 through 1949 was in the total respective amounts of $10,787.12, $16,253, $21,385.13, $28,166.63, $34,941.13, $38,309.30, $43,459.30, and $40,624.30. The petitioners' reserve for depreciation of automobiles on December 31 of each of the years 1942 through 1949 *119 was in the total respective amounts of $550, $825, $1,100, $1,100, $1,296.50, $1,689.50, $1,299.66, and $798.66. The petitioners owed a loan payable to Archer & Co. on December 31, 1942, in the total amount of $9,000. The petitioners made personal disbursements during each of the years 1943 through 1949 in the total respective amounts of $8,599.04, $8,535.66, $9,223.92, $9,626.50, $13,645.49, $12,522.54, and $16,293.09. Of the foregoing amounts, the deductible personal expenditures (contributions, interest, taxes, etc.) of petitioners for the years ended December 31, 1943, through December 31, 1949, were in the total respective amounts of $4,599.04, $4,536.66, $5,223.92, $6,026.50, $7,391.56, $6,729.45, and $6,885.22. The cash expenditures of the petitioners for living expenses for the years December 31, 1943, through December 31, 1945, were $4,000 per year and for the years December 31, 1946, through December 31, 1949, were $3,600 per year. The petitioners made gifts during each of the years 1943 through 1945 and 1947 through 1949 in the total respective amounts of $8,629.52, $3,948.92, $21,044.04, $10,767.36, $12,122.40, and $2,392.42. The petitioners realized during the *120 years ended December 31, 1945, 1946, and 1948 nontaxable portions of long-term capital gains (50 percent) in the total respective amounts of $5,748.22, $28,500 and $6,243.58 which resulted from the sale of the Fedders Manufacturing Company stock in 1945, the distribution in 1946 by Burt Cold Storage, Inc., of an amount in excess of the basis of the stock, and the sale of the Skelly Oil Company and Mission Corporation stock in 1948. During the year ended December 31, 1947, the petitioners received a nontaxable dividend in the amount of $175. The petitioners' net income or loss as reported on their income tax returns or as adjusted as a result of prior internal revenue agents' reports for the years 1943 through 1949 was as follows for the respective years: $15,602.77, $8,898.03, $11,550.23, $12,729.24, ($911.95), ($17,841.34), and ($2,309.46). In the notice of deficiency involved herein the respondent determined that the net worth of the petitioners for the following years had increased in the indicated amounts and that therefore the difference between such amounts and the respective net incomes upon which the tax had been previously assessed constituted additional income to petitioners *121 under the provisions of the Code: Amount of increase of net
worth stated in the notice
Year
of deficiency
1943
$ 40,072.12
1944
38,885.24
1945
70,962.15
1946
157,202.65
1947
38,525.81
1948
62,447.61
1949
36,911.87
The copy of the notice of deficiency attached to the petition herein does not contain a copy of a net worth statement showing a computation of the amount of increases in net worth shown above for the indicated years. However, in their petition, the petitioners assigned as error, among others, the respondent's determination of the above-stated increases. Thereafter, and as a result of a request by the representatives of the petitioners for a better statement of the allegations of the respondent respecting the issue of fraud, the respondent, prior to the hearing herein, filed an amendment to his answer in which he complied with such request. Attached to the amendment to answer and as part thereof was a net worth statement prepared by respondent and designated Schedule A, which is as follows: NET WORTH STATEMENT
ASSETS
12/31/42
12/31/43
12/31/44
12/31/45
Cash on hand: Bank balances
$ 5,462.28
$ 17,448.65
$ 42,115.47
$ 58,647.38
Bank drafts and
official checks - R. A.
O'Connor
6,704.60
Bank drafts and
official checks - R. A.
O'Connor & Co. - 50%
Undeposited fees and
3,800.00
29,291.33
checks
R. A. O'Connor & Co.
money advanced
(50%)
R. A. O'Connor personal
advances to Burt
Cold Storage
Investments: Stocks and bonds
105,451.73
106,501.73
111,134.48
132,184.48
Burt Cold Storage stock
3,000.00
3,000.00
3,000.00
3,000.00
Property: Real estate and
147,850.00
147,850.00
142,850.00
143,100.00
equipment
Due R. A. O'Connor land
3,700.00
3,263.41
contract - Sirgey
Automobiles: Oldsmobile
$ 1,100.00
$ 1,100.00
$ 1,100.00
$ 1,100.00
Mercury
Chrysler
Cadillac
Other assets: Money in suspense
4,751.52
7,270.00
accounts
Life insurance C.S.V.
13,812.91
13,812.91
13,812.91
13,812.91
TOTAL ASSETS
$276,676.92
$289,713.29
$326,264.38
$398,374.11
LIABILITIES
Note payable - Hayman
$ 7,500.00
$ 7,500.00
Reserve for
depreciation -
buildings and equip-
ment
$ 10,787.12
$ 16,253.00
21,385.13
28,166.63
Reserve for
550.00
825.00
1,100.00
1,100.00
depreciation -
automobiles
Loan payable to Archer
9,000.00
& Co.
TOTAL LIABILITIES
$ 20,337.12
$ 17,078.00
$ 29,985.13
$ 36,766.63
NET WORTH
$256,339.80
$272,635.29
$296,279.25
$361,607.48
Less: Net Worth at
256,339.80
272,635.29
296,279.25
beginning of year
Increase
16,295.49
23,643.96
65,328.23
Plus: Personal
8,599.04
8,535.66
9,223.92
disbursements
Gifts
8,629.52
3,948.92
21,044.04
Balance
33,524.05
36,128.54
95,596.19
Less: 50% long-term
5,748.22
capital gains
Balance
33,524.05
36,128.54
89,847.97
Less: Nontaxable
dividend
Balance
33,524.05
36,128.54
89,847.97
Less: Allowable
4,599.04
4,535.66
5,223.92
personal disbursements
Corrected net income
28,925.01
31,592.88
84,624.05
Net income per return
15,602.77 [1]
8,898.03 [1]
11,550.23 [1]
or prior revenue
agent's report
INCREASED INCOME PER
$ 13,322.24
$ 22,694.85
$ 73,0073.82
NET WORTH METHOD
*122 ASSETS
12/31/46
12/31/47
12/31/48
12/31/49
Cash on hand: Bank balances
$150,068.30
$166,914.22
$134,302.26
$192,911.56
Bank drafts and official
checks - R. A.
O'Connor
31,645.93
31,477.64
19,321.31
9,496.31
Bank drafts and official
checks - R. A.
O'Connor & Co. - 50%
8,855.40
5,955.40
Undeposited fees and checks
6,436.17
10,513.11
10,529.00
4,488.75
R. A. O'Connor personal
advances to Burt
Cold Storage
40,000.00
Investments: Stocks and bonds
149,419.00
161,786.15
188,848.67
206,387.58
Burt Cold Storage stock
Property: Real estate and equipment
139,570.00
126,970.00
126,595.00
114,636.00
Due R. A. O'Connor land
3,001.51
contract - Sirgey
Automobiles: Oldsmobile
1,100.00
1,100.00
1,100.00
Mercury
1,965.00
1,965.00
Chrysler
2,995.00
2,995.00
Cadillac
2,171.55
Other assets: Money in suspense accounts
6,720.87
7,200.00
7,200.00
Life insurance C.S.V.
13,812.91
13,812.91
13,812.91
13,812.91
TOTAL ASSETS
$510,088.53
$532,603.75
$562,962.69
$573,891.91
LIABILITIES
Notes payable - Haymen
Reserve for depreciation -
buildings and equip-
ment
$ 34,941.13
$ 38,309.30
$ 43,459.30
$ 40,624.30
Reserve for depreciation -
1,296.50
1,689.50
1,299.66
798.66
automobiles
Loan payable to Archer & Co.
TOTAL LIABILITIES
$ 36,237.63
$ 39,998.80
$ 44,758.96
$ 41,422.96
NET WORTH
$473,850.90
$492,604.95
$518,203.73
$532,468.95
Less: Net Worth at beginning
361,607.48
473,850.90
492,604.95
518,203.73
of year
Increase
112,243.42
18,754.05
25,598.78
14,265.22
Plus: Personal disbursements
9,626.50
13,645.49
12,522.54
16,293.09
Gifts
10,767.36
12,122.40
2,392.42
Balance
121,869.92
43,166.90
50,243.72
32,950.73
Less: 50% long-term capital
28,500.00
6,243.58
gains
Balance
93,369.92
43,166.90
44,000.14
32,950.73
Less: Nontaxable dividend
175.00
Balance
93,369.92
42,991.90
44,000.14
32,950.73
Less: Allowable personal
6,026.50
7,391.56
6,729.45
6,885.22
disbursements
Net income per return or
prior revenue agent's
report
12,729.24 [1]
(911.95)
(17,841.34)
(2,309.46)
INCREASED INCOME PER NET
WORTH
METHOD
$ 74,604.18
$ 36,512.29
$ 55,112.03
$ 28,374.97
*123 Stock certificates of Burt Cold Storage, Inc., were altered by Raymond after their introduction in evidence during the first trial of the indictment against him in the District Court, Western District of New York, and prior to their introduction in evidence during the second trial of the indictment. The petitioners had no cash on hand as of December 31, 1942. For the years 1920 through 1926 no income tax returns were filed by the petitioners. For the year 1927, the petitioners reported and paid a total income tax liability of $108.40 and filed nontaxable returns for each of the years 1928, 1929, and 1930. For the years 1931 through 1942, the following income tax liabilities of the petitioners were assessed and paid: Year
Amount
1931
$ 62.78
1932
108.55
1933
73.85
1934
None
1935
73.08
1936
204.00
1937
328.65
1938
166.20
1939
14.47
1940
34.86
1941
465.89
1942
624.55
For the years 1930 through 1938, the petitioners reported the following amounts of net income: Year
Amount
1930
$ 5,369.85
1931
7,115.98
1932
5,922.62
1933
5,528.65
1934
4,060.56
1935
6,681.27
1936
10,505.07
1937
10,194.01
1938
9,822.15
*124 In their income tax returns for the years 1939 through 1942, the petitioners reported the following amounts of net income: Year
Amount
1939
$4,632.48
1940
4,730.27
1941
7,351.82
1942
5,812.57
The petitioners received a distribution of $3,314.60 from the estate of Thomas O'Connor deceased, father of Raymond, and $8,962.15 from the estate of Delia O'Connor, deceased, stepmother of Raymond, during unspecified years. The records of the Power City Trust Company disclose a history of many small borrowings by Raymond during the 1930's and 1940's prior to January 1, 1943, often encompassing relatively nominal amounts and for personal needs and purposes. Raymond submitted net worth statements to the Power City Trust Company in which he listed the following amounts of "cash": December 3, 1930
$2,540.00
April 5, 1932
2,850.10
July 21, 1933
2,958.00
August 31, 1935
2,551.00
In September 1950, respondent's Special Agent Montz discussed with Raymond the amount of currency the latter had on hand at the close of 1946. Raymond stated that such amount of cash would have been more than $25,000 but would not have reached $50,000, that there was *125 no record of it, and that there was no one who knew of it. When examined under oath by Montz by questions and answers during an examination on January 30 and 31, 1951, as to his cash on hand in 1942, Raymond stated that he could not recall back that far and when asked as to around 1945, stated that it was about $88,000. At the hearing herein Raymond testified that a woman employee of R. A. O'Connor & Company and an accountant associated with that company on January 1, 1943, in the attic of Raymond's home and in Raymond's presence, counted his currency which consisted of 80 packages, each of which was composed of 50 twenty-dollar bills and all totaling $80,000. The records of the Power City Trust Company disclose that on January 13, 1943, Raymond obtained a new loan from that company in the amount of $808.13 for "family use." Raymond testified to a second count of his currency in June 1943 by the same parties, at the same location, of the same number of packages, and of the same denomination, and totaling the same amount as of January 1, 1943, namely $80,000. The records of the Power City Trust Company disclose that on May 21, 1943, Raymond obtained a secured loan from it in the *126 amount of $710.50. Raymond further testified at the hearing herein that around the first week in January 1946 he and the above-mentioned accountant associated with R. A. O'Connor & Company counted his currency at which time there were "29 packages." The LaHay Theatre Corporation was the personal holding corporation of Adam C. Hayman, deceased. The corporation had become defunct in the late 1940's and the State of New York never made a claim for taxes from it. At least for the last 15 years, the State of New York has not made any claim for taxes from the estate of Adam C. Hayman or from the LaHay Theatre Corporation, and all of the debts of the estate of Adam C. Hayman have been paid, including tax liabilities owed to the State of New York. The Falls Mortgage Corporation was liquidated in either 1929 or 1930 and all of its assets were distributed at that time. During the hearing herein the petitioners submitted in evidence certain pages from their General Ledger. The exhibits were submitted herein as representing leads which had been furnished by Raymond in 1953 to the United States Attorney's office and were received in evidence herein as such. Following submission of the pages *127 to the United States Attorney's office, respondent's Special Agent Montz made photocopies of them. An examination of the exhibits as submitted herein in connection with photocopies thereof as submitted to the United States Attorney's office discloses substantial alteration thereof by Raymond prior to their submission herein. The income tax returns of the petitioners for the years 1943 through 1949 were false and fraudulent and were made with intent to evade tax. Part of the deficiency for each of the years is due to fraud with intent to evade tax. Opinion Issue 1. Raymond A. O'Connor and Bertha K. O'Connor Joint Income Tax Returns At the beginning of our consideration of this issue we observe that the petitioners correctly recognize that the respondent's determination that the income tax return of the petitioners for the years in issue were joint returns is presumed to be correct and that the burden rests on petitioners to show that the returns are otherwise. The petitioners make the following statement on brief: On June 5, 1961, in O'Connor v. United States, 291 F. 2d at 525, the United States Circuit Court of Appeals held… "Mrs. O'Connor (Bertha K. O'Connor) *128 who had filed no income tax returns…" Since the Second Circuit Court of Appeals has already ruled that the Petitioner herein, Bertha K. O'Connor, filed no income tax returns, it is res adjudicata that she did not file a joint income tax return. United States v. O'Connor, 291 F. 2d 520, 525 (C.A. 2, 1961), contains the following: Finally, appellants argue that the Government did not establish it had valid claims against any of the defendants, and especially against the property of Mrs. O'Connor, who had filed no income tax returns, or of Mrs. Fitzpatrick. Even though, as we later hold, the assessment is not conclusive in an action under § 7403, the remedy of the appointment of a receiver does not depend on the Government's having already proved its claim and its lien; that is one of "the matters" which the court is to "adjudicate * * * and finally determine." * * * From our examination of the first abovequoted statement contained in 291 F. 2d 525 in connection with the latter, we think it is apparent that the Court of Appeals was merely stating an argument that had been presented to it and that it was not in anywise ruling on or adjudicating the *129 question of whether Bertha had filed separate income tax returns for the years in issue or had not filed joint income tax returns for such years. The petitioners contend that we should conclude and find from a consideration of the record herein that as to Bertha, none of the returns in issue were joint returns of hers, that as a consequence Raymond did not file a joint return for any of the years involved and that accordingly he is not liable for any deficiency in tax or any addition to tax for such years based on a joint net worth computation made as to him and Bertha. In support of their position the petitioners urge that Bertha never intended to file a joint income tax return for any of the years 1943 through 1949 and that she did not sign a joint return for any year except 1948 which it is urged is not to be recognized as such here. The respondent contends that the record establishes that the petitioners intended to and did file joint income tax returns for each of the years in issue and that his determination should be sustained. Pursuant to receipt by petitioners of respondent's notice of deficiency the petitioners filed in this Court their joint petition which was signed *130 by each of them and was verified by each. The petition as filed presented no issue respecting respondent's action in determining that the returns involved were joint returns and in determining the deficiencies on a joint basis. On the contrary, some of the recitals contained in the allegations of fact of the petitioners were to the effect that the returns for the years in issue were the returns of the petitioners. Thereafter the respondent filed his answer. Subsequent to the respondent's filing of his answer, the petitioners made no move to amend their petition in any respect until near the end of the last day of the hearing, which was a number of years after petitioners filed their petition, when petitioners moved and were granted leave to amend their petition to conform to proof. Within the time allowed, the petitioners filed the amendment to their petition wherein they alleged that Bertha did not make or file any Federal income tax returns for the years in issue and that Raymond made and filed his individual returns for the taxable years ended December 31, 1943, through December 31, 1949. The amendment was signed by both Raymond and Bertha but was verified only by Raymond. Subsequently *131 the respondent filed his answer, not only denying the allegations contained in the amendment but additionally alleging that the petitioners filed joint income tax returns for the years in issue. The hearing herein lasted for approximately 3 weeks during which Raymond testified approximately 9 days. Nowhere did he raise the issue that the returns here involved were not joint returns. The petitioners' denial of joint returns is predicated solely upon the testimony of Bertha and is to the effect that from 1933 to 1950 she had no taxable income, that she filed no Federal income tax returns, that she never discussed with Raymond any Federal income tax returns he may have signed or filed, and that she did not either alone or in participation with personnel of the R. A. O'Connor & Company partnership, or with anyone else, participate in the preparation of an income tax return for herself or Raymond. She further testified that, with the exception of the 1948 return, she did not sign any income tax return from 1933 to 1950 and upon being told in the office of the R. A. O'Connor & Company partnership by someone other than Raymond and whose name she does not remember, that under a new law it *132 was mandatory for her to sign a 1948 income tax return, she voluntarily signed a joint Federal income tax return for her and Raymond. She also has testified that when she signed the return, she did not intend to file a Federal tax return. The record, however, is silent as to what she intended if she did not intend to file a return. Respecting Bertha's testimony that she never filed a Federal income tax return from 1933 to 1950 because she had no taxable income, we observe that she made no attempt to establish or to approximate the amount of her gross income or her net income for any of the years in issue. We further observe that she has testified that she collected and retained rent from some of the real property standing in her name, the amount of which he does not know, and that during the years in issue when she received interest or dividends, the amounts of which she did not state, she deposited them in her bank account or spent them. During the respondent's question and answer examination of Raymond in January 1951 by Special Agent Montz, Raymond testified as to his estimate of his cost of personal living expenses and his cash expenditures over and above check expenditures *133 for the years 1947 through 1949 and the amount of such expenses and expenditures for years prior to 1947 referred to as war years. During the foregoing examination Raymond was asked if any deposits in the accounts of his children and his wife were money from his income. To that Raymond replied: "I think to the best of my knowledge in my children's accounts there is about $700 from my income, and in my wife's account there would be roughly $3,000 every year." From the foregoing testimony of Raymond it appears that he deposited in Bertha's account approximately $3,000 every year, or $21,000 for the 7-year period, which was money from his income. Bertha did not state any reason for, or give any explanation as to the deposit of the $3,000 a year in her account or state the disposition she made of it or otherwise mention the item or amount. In view of the foregoing state of the record we are of the opinion that the petitioners have not shown that Bertha's failure to file a separate Federal income tax return for herself was because she had no taxable income. The verification of the 1948 return, which was effected by the execution of the signatures thereto of Raymond and Bertha, bore the *134 date "2/22/49." Printed on the face of the return and in somewhat darker type was the following statement: HUSBAND AND WIFE. - To obtain benefits of split-income provisions, husband and wife must file a joint return. * * *
While not so stating on the return, the above-quoted provision doubtless referred to the provisions of the Revenue Act of 1948, enacted in that year, which authorized, under stated requirements, the computation on the split-income basis of the income tax liability of a husband and wife living together. In a letter from Raymond, dated February 23, 1949, to the collector transmitting the 1948 return, Raymond pointed out that the return indicated a refund due of $7,200 and requested that the collector send the refund at his earliest convenience. The return shows that it was received in the office of the collector on February 25, 1949. We also have considered Bertha's testimony that when she signed the 1948 return, she did not intend to file a Federal tax return. She stated no reason or basis for making such statement and the petitioners have not pointed to any factual basis in corroboration thereof. On the contrary, her conduct in signing the return merely *135 on the basis of what she was told by someone whose name she does not remember and without consultation with Raymond raises considerable doubt as to her good faith in so testifying. In our view her signing the return in the situation stated by her appears to be more consistent with an awareness of a wife who, along with her husband, had habitually over the years filed joint income tax returns and that her signing the return would evidence to the taxing officials the fact that the instant return also was a joint return. At any rate, the petitioners have not pointed us to anything in the record to indicate that the purpose of Bertha's signing the return was to evidence to the taxing officials that such signing was not what it purported to be, namely, her good faith signing of a bona fide joint income tax return. Raymond is a party to the return and as such also had responsibility for verifying as to its correctness and completeness. However, he here is seeking to repudiate Bertha's joint verification of it for the stated attempted purpose of effecting the full discharge of Bertha's liability involved herein and also the full discharge of his liability as well. We have attempted to reconcile *136 Bertha's statement that when she signed the 1948 return, she did not intend to file a Federal income tax return, with her conduct in voluntarily signing the return on the basis of what she said she had been told by someone whose name she does not remember and without consulting Raymond, the other party signatory to the return. Our attempts have been futile. Since neither Raymond nor Bertha has shown any attempt at such a reconciliation, we can only leave the parties where we find them and conclude that Bertha's voluntary action in signing the return was indicative of her real intention. Thereby, in our view, the action of each of the parties in signing the return appears in a clear, natural, and normal context. Accordingly, we conclude and hold that the 1948 return was the joint income tax return of Raymond and Bertha. Under section 51(b) of the Code, [2] if a joint return is filed by a husband and wife living together, they are jointly and severally liable for the full tax liability. Such liability covers not only the tax itself, but also any addition to the tax on account of fraud, notwithstanding *137 that the wife may have signed the return in blank or that she was innocent of fraud. Myrna S. Howell, 10 T.C. 859 (1948), affd. 175 F. 2d 240 (C.A. 6, 1949); Dora S. Hughes, 26 T.C. 23 (1956); Irving S. Federbush, 34 T.C. 740 (1960), affd. 325 F. 2d 1 (C.A. 2, 1963).
It is not essential that a return be signed by both spouses in order to constitute a joint return, Kann v. Commissioner, 210 F. 2d 247 (C.A. 3, 1953), affirming 18 T.C. 1032 (1952), certiorari denied 347 U.S. 967 (1954); Myrna S. Howell, supra; Joseph Carroro, 29 B.T.A. 646 (1933), provided the return was intended *138 to be a joint return, Hyman B. Stone 22 T.C. 893, 900 (1954). The inclusion of income and deduction items of a wife in the return of a husband has been regarded as a factor supporting the conclusion that the return was a joint return of the husband and wife. Irving S. Federbush, supra, at 756; Myrna S. Howell, supra., Elsie S. Bour, 23 T.C. 237 (1954); Walter M. Ferguson, Jr., 14 T.C. 846 (1950). The Federbush case involved the taxable years 1942 through 1946 and 1948. In that case, without reason to do otherwise, this Court proceeded on the premise that the wife had no income and observed that with respect to the existence of items of deduction, the situation was otherwise, in that during the years in issue the husband had paid the real estate taxes on properties he had given her and which they had used as their homes. In holding that the returns in issue were joint returns of petitioner and his wife, we said: The facts show that in each and every year deduction was claimed for real estate taxes, and, so far as appears, Silvia [the wife] was the only one of the two who owned real estate. First the home in *139 Monroe and next the home in Great Neck was shown to have been in her name, and it has been held that taxes paid by a husband on real estate occupied by himself and his wife as a home and owned by her and held in her name may not be deducted in the husband's separate return, even if he has given the property to her. Myrna S. Howell, supra, and William Ainslie Colston, 21 B.T.A. 396, affd. 59 F. 2d 867, certiorari denied 287 U.S. 640. See also Inez H. Brown, 1 T.C. 225. It is to be noted that except for 1948, all of the years herein were prior to the Revenue Act of 1948, the statute which granted to a husband and wife the current tax computing advantages where a joint return is filed, and for years prior to 1948, the advantage of a joint return was all the more obvious, where the joining of the wife would bring additional deductions, as well as the dependency credit, to the return without any increase in gross income. The following is a statement for the years 1943 through 1949 of income and deductions pertaining to properties held in Bertha's name which were reported and claimed in the returns covering those years *140 and which inured to the benefit of both petitioners by reducing their joint reported tax liabilities for the respective years: In our view the foregoing amounts of farm income, expenses, losses, and deductions for depreciation of properties when considered in connection with what was said and held in the Federbush case warrants the conclusion that the return of the petitioners for the years in issue were and were intended by petitioners to be their joint income tax returns for such years. Accordingly we have found as a fact that the income tax returns here in issue were joint returns of the petitioners and we therefore 1943
1944
1945
Farm income
$ 5,649.15
$ 703.40
$ 1,014.83
Farm expenses exclusive of
15,665.12
13,492.39
12,026.62
depreciation
Farm losses
$10,015.97
$12,788.99
$11,011.79
Depreciation -
Wheatfield Farm
327.51
327.50
327.50
Youngstown Farm [1]
450.00
450.00
450.00
Listed on return but not
Youngstown Farm fruit trees
1,475.00
applied against income
Tractors, spray rigs, etc.
1,000.00
1,000.00
1,000.00
Niagara St. property
320.00
320.00
320.00
73rd St. property
160.00
160.00
160.00
9013 S. Military Rd.
200.00
200.00
Wheatfield Farm - trees
Net farm fire loss
Casualty loss on fruit trees [2]
Total net deductions pertaining
to
properties solely in name of
Bertha
K. O'Connor applied against
total re-
ported income
$13,948.48
$15,246.49
$13,269.29
*141 1946
1947
1948
1949
Farm income
$ 4,276.05
$ 7,776.29
$ 5,163.67
$ 4,211.68
Farm expenses exclusive of
17,199.61
20,231.99
25,655.36
17,640.26
depreciation
Farm losses
$12,923.56
$12,455.70
$20,491.69
$13,428.58
Depreciation -
Wheatfield Farm
327.50
375.00
375.00
Youngstown Farm [1]
225.00
237.50
440.00
440.00
Youngstown Farm fruit trees
1,085.00
1,225.00
1,085.00
1,085.00
Tractors, spray rigs, etc.
750.00
750.00
1,070.00
1,070.00
Niagara St. property
480.00
73rd St. property
160.00
160.00
160.00
160.00
9013 S. Military Rd.
Wheatfield Farm - trees
306.50
1,500.00
Net farm fire loss
6,130.00
Casualty loss on fruit trees [2]
3,059.00
2,287.08
3,234.00
Total net deductions pertaining
to
properties solely in name of
Bertha
K. O'Connor applied against
total re-
ported income
$25,446.56
$18,615.28
$23,621.69
$19,792.58 sustain the respondent's determination as to the instant issue. Issue 2. Barring of Assessment and Collection *142 of Deficiencies in Tax and Additions to Tax for 1943 Through 1946 by Section 3631 of the Code By their petitioner the petitioners have presented as an issue the failure of the respondent to determine that assessment and collection of the deficiencies in tax and additions to tax for 1943 through 1946 are barred under section 3631 of the Code because the respondent during the period August 2, 1950 to July 27, 1951, violated the foregoing section of the Code "against petitioners' wishes" by making an additional inspection of petitioners' books of account when theretofore the respondent had made two examinations of petitioners' records for each of the years 1943 and 1945 and one examination of their records for 1944 and 1946. No claim of applicability of section 3631 for the years 1947 through 1949 is here made by petitioners. The provisions of section 3631 are set out below. [3] That section provides that "only one inspection of a taxpayer's books of account" shall be made for each taxable year unless the taxpayer requests otherwise or unless the Commissioner, after investigation, notifies *143 the taxpayer in writing that an additional inspection is necessary. The petitioners take the position that the additional inspection for the taxable years here involved, 1943 through 1946, was made by the respondent in 1950 and 1951 without any request from petitioners, without any notification by respondent to the petitioners that it was necessary, and without waiver by petitioners of their rights under section 3631, and contend that the additional inspection was illegal and that the deficiencies in tax and additions to tax for the taxable years in issue should be held to be invalid. The petitioners contend that since the respondent's agents at the beginning of their inspection of petitioner's books of account in August 1950 informed the petitioners that they were making an inspection of *144 the books of the petitioners for the years 1947 through 1949, the petitioners were unaware ofnthe additional inspection for 1943 through 1946 and consequently were not in a position to prevent it, to consent to it, or to insist on a reopening letter before they permitted it. The respondent, pointing to the evidence presented by petitioners as to the loss or destruction of substantially all of petitioners' books of account for the years in issue, contends that no inspection was made or could have been made of such books because of the petitioners' inability and the consequent failure to produce them for inspection. Furthermore, the respondent points out that the petitioners have not shown that during any inquiry or examination made by respondent's representatives, the petitioners made any objection to the action or conduct of such representatives on the ground that such inquiry or examination constituted or would constitute a second or additional inspection of the petitioners' books of account. The respondent urges that even though the petitioners were not furnished a written notice as provided by section 3631, they are to be regarded as having waived any objection they had by consenting *145 to the reexamination. Respecting the contention of petitioners that they were unaware of respondent's agents extending their inspection of petitioners' affairs from the years 1947 through 1949 to the years 1943 through 1946 and consequently were unaware of an additional inspection of the years 1943 through 1946 so as to be unable to prevent it, we can only observe that an examination of the question and answer statement given under oath by Raymond to respondent's Special Agent Montz on January 30 and 31, 1951, involved to a considerable extent items and amounts relating to years from 1941 to the year ended with 1946. Other portions of the statement related to the subsequent years 1947 through 1949. At the end of the question and answer statement, Raymond was asked: "How have the examining officers treated you in this investigation?" To that Raymond replied: "I would say most excellent, sir." Nowhere in the foregoing statement did Raymond raise an issue regarding a second or additional inspection of petitioners' books of account for the years 1943 through 1946. On July 17, 1951, Raymond wrote Montz and made additions and corrections to his January 30 and 31, 1951, testimony but did *146 not mention or complain about a second or additional inspection of petitioners' books of account. During the course of his testimony in the instant hearing Raymond indicated that he had specifically waived any objection the petitioners might have had under section 3631. He testified that in July 1952 he had made the following statement to Montz: "When are you coming to my office to check these discrepancies? I have documentation for all my statements." He further testified that in June 1952 he made the following statement to an attorney for the Internal Revenue Service: "Mr. Chassis said to me, 'you don't have to answer any questions, or give any statements,' and I said, 'I'll waive any of my rights and tell you anything you ask. I'll give you full cooperation'." Respecting Chassis' statement to Raymond that Raymond did not "have to answer any questions, or give any statements" and Raymond's reply thereto, the petitioners on reply brief contend that in Raymond's reply he "was waiving any privilege against self-incrimination" and that his statement is not to be construed as extending to an examination by respondent of petitioners' books and records for the years 1943 through 1945 *147 without the issuance of the notice required by section 3631. Obviously Raymond's statement to Chassis was broad. When considered against the background of other pertinent portions of the record, we think it was intended to be broad and was not subject to the limitation proposed by petitioners in their reply brief. In the instant proceeding the petitioners have included herein the taxable year 1946. The applicability of section 3631 to the petitioners' taxable year 1946 was considered and adjudicated in United States v. O'Connor, 237 F. 2d 466 (C.A. 2, 1956), where that Court stated and held as follows: Prior to trial defendant moved to suppress all documents, records, and papers obtained during several reexaminations of defendant's 1946 books, on the ground that they were illegally obtained in violation of 26 U.S.C. (I.R.C. 1939) § 3631, now 26 U.S.C. ( I.R.C. 1954) § 7605(b). Defendant did not claim that he had objected to these reexaminations, but merely that the Commissioner had not notified him in writing that his 1946 books were to be reexamined. Even assuming, arguendo, that this evidence is inadmissible because *148 of the Commissioner's failure to provide taxpayer with the written notice mentioned in § 3631, defendant waived any objection by consenting to the reexamination. United States v. United Distillers Products Corp., 2 Cir., 1946, 156 F. 2d 872; Sutor v. Commissioner, 1951, 17 T.C. 64; Thelma Blevins, 14 T.C.M. 840 [affd. 238 F. 2d 621 (C.A. 6, 1956)]. In view of the foregoing, further mention of the petitioners' taxable year 1946 will not be made. During all of the taxable years involved in the instant proceeding Raymond was an accountant of 20 or more years of experience, of which 10 or more years were as a certified public accountant. In addition, he had had broad experience in income tax practice. In view of the foregoing and of Raymond's participation as a witness and otherwise in the case respecting the taxable years 1943 through 1949 and in the absence of evidence otherwise, we think it incredible for the petitioners to take the position herein as they have done, that they were so unaware of respondent's agents extending their investigation to cover the taxable years 1943 through 1945 instead of limiting it to the *149 taxable years 1947 through 1949, as to be unable to prevent or to object to the extension or to demand from the respondent full compliance with the provisions of section 3631. At least at, if not before, Raymond's question and answer examination, he properly could have requested respondent's full compliance with the provisions of section 3631. Instead, we find Raymond, in response to a question by Montz, telling the latter that the examining officers had treated him "most excellent, sir." In our view the respondent's determination of the instant issue is to be sustained by reason of the petitioners' waiver of respondent's compliance with section 3631 as a result of petitioners' consent to the additional examination for the years 1943 through 1945. Reineman v. United States, 301 F. 2d 267 (C.A. 7, 1962), relied on by petitioners, is inapplicable here because of factual differences. Issue 3. Suppression of Evidence Obtained by Special Agent George Montz The petitioners state that on June 25, 1950, Richard Wetzel, a revenue agent, began an examination of petitioners' books and records for 1947; that, on an informant's letter stating that Raymond was not correctly *150 reporting his taxable income, Special Agent George Montz entered the case on August 2, 1950, and, on August 9, 1950, began an examination of the books and records of the petitioners for 1948 and thereafter, until the end of 1950, continued his connection with the case. The petitioners take the position that the evidence obtained in this proceeding by Montz from August 2, 1950, to the end of 1950 was obtained illegally because during that period Raymond did not have counsel in connection with the case and accordingly was denied his constitutional rights and that as a consequence the evidence obtained by Montz from August 2, 1950, the date when the case had reached the "accusatory stage," to the end of that year should be suppressed herein under the rule of Escobedo v. Illinois, 378 U.S. 478, 485 (1964). The petitioners further state that a taxpayer's right to counsel under the Sixth Amendment to the Constitution attaches when the special agent contacts the taxpayer because the primary, if not exclusive, function of the special agent is investigation of alleged tax crimes. As stated in the Escobedo case: The critical question in this case is whether, under the circumstances, *151 the refusal by the police to honor petitioner's request to consult with his lawver during the course of an interrogation constitutes a denial of "the Assistance of Counsel" in violation of the Sixth Amendment to the Constitution as "made obligatory upon the States by the Fourteenth Amendment," Gideon v. Wainwright, 372 U.S. 335, 342, and thereby renders inadmissible in a state criminal trial any incriminating statement elicited by the police during the interrogation. As stated in the foregoing case: We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied "the Assistance of Counsel" in violation of the Sixth Amendment to the Constitution as "made obligatory upon the States by the Fourteenth Amendment, *152 " Gideon v. Wainwright, 372 U.S., at 342, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial. * * *
Nothing we have said today affects the powers of the police to investigate "an unsolved crime." Spano v. New York, 360 U.S. 315, 327 (Stewart, J., concurring), by gathering information from witnesses and by other "proper investigative efforts." Haynes v. Washington, 373 U.S. 503, 519. We hold only that when the process shifts from investigatory to accusatory - when its focus is on the accused and its purpose is to elicit a confession - our adversary system begins to operate, and, under the circumstances, here, the accused must be permitted to consult with his lawyer. The petitioners here take the position that from the time Special Agent Montz entered the case on August 2, 1950, Raymond was entitled to the warning of his right to counsel under the rule of the Escobedo case. A like position was taken in a similar situation in Kohatsu v. United States, 351 F. 2d 898 (C.A. 9, 1965), certiorari denied 384 U.S. 1011 (1966), petition for rehearing denied *153 385 U.S. 891 (1966). In the Kohatsu case, a revenue agent, in June 1960, began an investigation of the taxpayer's, Kohatsu's, income tax return for 1958. Thereafter, in June 1958, the revenue agent informed the taxpayer that bank deposit records showed deposits in excess of income reported in the taxpayer's return for 1958. Other meetings thereafter occurred between the revenue agent and the taxpayer. In early August 1961, the investigation was referred to a special agent of the Intelligence Division of the Internal Revenue Service. Thereafter during September and October 1961, the special agent had several meetings with the taxpayer at which he secured additional documents from him. In late 1961 he turned the investigation and various documents over to another special agent who continued the investigation without meeting with the taxpayer until May 10, 1963. On that date, the taxpayer and he had a "question and answer conference" which also was attended by another agent and reporter of the Internal Revenue Service. The special agent testified that he advised the taxpayer "as to his constitutional rights" and that he, the taxpayer, did not have to say anything or offer *154 any document which might tend to incriminate him under any of the Federal laws. The taxpayer, however, testified that he first learned in August 1963 that he was being investigated with the possibility of criminal prosecution. The taxpayer argued that the investigation "focused on the appellant [the taxpayer]," not later than July 28, 1961, and certainly not later than early August 1961 when the revenue agent referred the investigation to the first special agent. Respecting that argument the Court pointed out that - In taking the phrase "focus on a particular suspect" out of context, appellant would extend the rule of Escobedo beyond any logical implication of the effect of that decision. The Supreme Court in Escobedo referred to an unsolved crime. The existence of the crime was apparent. The police were seeking to identify the offender. The accused had been taken into custody. In the instant case the essential question to be determined by the investigations of the revenue agents was whether in fact any crime had been committed. The accused had not been indicted or arrested. Thereupon the Court in the Kohatsu case observed that the situation there presented was comparable *155 to that presented in an earlier case of that Court, Irwin v. United States, 338 F. 2d 770, 777 (C.A. 9, 1964), and stated its reasoning in the Irwin case wherein it held that the rights under the Sixth Amendment and under the Fourth and Fifth Amendments of the parties there involved were not violated, and then stated that the same reasoning applied in the Kohatsu case with respect to the taxpayer's claim of violation of constitutional rights under both the Sixth Amendment and the Fourth and Fifth Amendments. The Court then considered further argument of the taxpayer, namely, that under the "philosophy" of Escobedo, Government agents must be "held to the duty, dating from the time they suspect the taxpayer of fraud, of informing him of the criminal nature of the investigation and his absolute constitutional right to remain silent under the Fifth Amendment." Respecting such argument the Court stated that it found nothing in the Escobedo opinion or its "philosophy" which would impose this duty upon revenue agents during their investigation of a taxpayer's returns and records. After observing that all statements made and all documents delivered were voluntary acts of the *156 taxpayer and were not induced by stealth, trickery, or misrepresentation and that all of the agents properly identified themselves to the taxpayer and disclosed their purpose to audit his returns and further observing that the taxpayer was fully apprised of the Government's concern with the accuracy of the taxpayer's returns, the Court found no violation of any of the taxpayer's, Kohatsu's, constitutional rights. The question and answer examination under oath of Raymond by Montz on January 30 and 31, 1951, contains the following: Questions were asked by Special Agent Montz and answers made by Mr. O'Connor. Q #1. Mr. O'Connor, I am about to question you in connection with matters pertaining to your Federal taxes, involving R. A. O'Connor & Company, Burt Cold Storage, and Burt Packing & Warehouse, Inc. I am instructed to advise you of your Constitutional rights, and that you do not have to answer any questions or make any statements that may tend to incriminate or degrade you under the laws of the United States. I also wish to inform you that anything you say may be used against you, but in order that the truth may be known, will you voluntarily make this statement? A. I will. *157 Q #2. Please stand and raise your right hand. (Witness complies). Do you swear that the answers you give to the questions asked you will be the truth, the whole truth, and nothing but the truth, so help you God? A. I do. Raymond's testimony shows that during or about June 1952 Raymond made the following statement to an attorney for the Internal Revenue Service: Mr. Chassis said to me, "You don't have to answer any questions or give any statements," and I said, "I'll waive any of my rights and tell you anything you ask. I'll give you full cooperation." There is no showing here that at the time of the foregoing statements made by Raymond he had been indicted or arrested. Neither is there any showing that Revenue Agent Wetzel and Special Agent Montz had progressed in their examinations farther than the investigatory stage of the income tax liabilities of the petitioners. In fact, there is no showing that Raymond at any time prior to or subsequent to June 25, 1950, was detained or denied a request to consult with his lawyer. In view of the holding of the Supreme Court in the Escobedo case and in the holding of the Court of Appeals for the Ninth Circuit in the Kohatsu case, *158 we find no violation of any of Raymond's constitutional rights and accordingly hold that petitioners are not entitled to the suppression of any evidence obtained by Special Agent Montz during the period August 2, 1950, to the end of 1950. See also Rickey v. United States, 360 F. 2d 32 (C.A. 9, 1966); United States v. Mains, - F. 2d - (C.A. 6, June 15, 1967); Morgan v. United States, - F. 2d - (C.A. 1, May 16, 1967); Smith v. United States, 250 F. Supp. 803 (D.N.J. 1966); and United States v. Fiore, 258 F. Supp. 435 (W.D. Pa. 1966). Issue 4. The Respondent's Use of the Net Worth and Expenditures Method in Determining the Petitioners' Unreported Income for 1943 through 1949 In the notice of deficiency the respondent determined that the net worth of the petitioners for the following years had increased in the indicated amounts and that therefore the difference between such amounts and the respective net incomes upon which the tax had been previously assessed constituted additional income under the provisions of the Code: Amount of increase of
net worth stated in
the notice of
Year
deficiency
1943
$ 40,072.12
1944
38,885.24
1945
70,962.15
1946
157,202.65
1947
38,525.81
1948
62,447.61
1949
36,911.87
*159 The copy of the notice of deficiency attached to the petition herein does not contain a copy of a net worth statement showing a computation of the amount of increases in net worth listed above for the indicated years. However, in their petition, the petitioners assigned as error, among others, the respondent's determination of the abovestated amount of increases in net worth for the respective years. Thereafter and as a result of a request by the representatives of the petitioners for a better statement of the allegations of the respondent respecting the issue of fraud, the respondent prior to hearing herein filed an amendment to his answer in which he complied with such request. Attached to the amendment to answer and as part thereof was a net worth statement designated as Schedule A, a copy of which appears in our findings of fact. In the amendment to answer the respondent alleged that during the taxable years 1943 through 1949, the petitioners omitted from their income tax returns net income in the respective amounts of $13,322.24, $22,694.85, $73,073.82, $74,604.18, $36,512.29, $55,112.03, and $28,374.97, which amounts had been arrived at in the manner disclosed in Schedule *160 A. Despite the fact that the foregoing amounts, except the amount shown for 1945, as to which year the respondent has moved for an increased deficiency, came within the ambit of the amounts determined by respondent in the notice of deficiency, the petitioners in their verified reply denied the foregoing allegation of the respondent and the case proceeded to hearing on the foregoing state of the pleadings and the net worth statement shown in Schedule A. The petitioners contend that respondent failed to investigate leads furnished to his agents by Raymond. The evidence bearing on the contention discloses that Special Agent Montz made extensive examinations and investigations of the leads submitted by Raymond and in instances where warranted made proper adjustments in his report or reports. In our opinion the petitioners' contention is without support in the record. The petitioners next take the position that their books and records for the years 1943 through 1949 were adequate and sufficient to show with reasonable accuracy their true income for those years and that the respondent erred in determining their unreported income for such years by the use of the net worth and expenditures *161 method. The record herein shows that the partnership books and records of R. A. O'Connor & Company for 1946 and prior years, including accounts receivable records, the books and records of Raymond for 1946 and prior years, and the records of Burt Cold Storage, Inc., had been thrown away or otherwise disposed of prior to the time Special Agent Montz began his investigation for such years. Partnership books and records and the books and records of Raymond were not all available for the years 1947 through 1949 and such of them as were available for those years were inadequate for the determination of partnership income, or the income of the petitioners for such years. In view of the foregoing situation in connection with the remainder of the record bearing on the question, we hold that the petitioners have failed to show that the books and records maintained by them for the years in issue were adequate to fairly or correctly reflect their income for such years. The petitioners, like every other taxpayer, were required by law to file an income tax return for each of the taxable years involved herein and to report thereon fully and honestly every item of gross income received by *162 them. Inherent in that requirement was the further requirement that they maintain adequate records of some kind to show to them and to the respondent the amount of income received by them in each year and the nature and basis for any deductions claimed. The respondent is not required to accept as accurate, complete, and correct, the returns filed or the sworn statement of the taxpayers that their returns completely and correctly disclose their tax liability. The respondent has authority to check the returns against the records of the taxpayers and if the records kept are incomplete, inaccurate, or otherwise unsatisfactory, he may seek information elsewhere to discover, assess, and collect the full tax liability imposed by law. Where the available records of a taxpayer do not fairly show the income of the taxpayer for the years in question, the respondent may use the increase in net worth method in determing taxable income. Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955); Morris Lipsitz, 21 T.C. 917 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955); *163 Dorothy L. Sutherland, 32 T.C. 862 (1959). In Morris Lipsitz, supra, it was said: The net worth method is not a system of accounting; it is not a substitute for either the cash or the accrual basis of accounting or any other recognized method of keeping books. When correctly applied to the facts of a particular situation it is merely evidence of income. And when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed, for the net worth method itself may provide strong evidence that the books are unreliable. * * * Having heretofore held that petitioners have failed to show that the books and records maintained by them for the years in issue were adequate for fairly or correctly reflecting *164 their income for those years, we hold that the respondent was justified in resorting to the use of the net worth method in determining the taxable income of the petitioners for such years. Relying on Exhibit GZ, which was stipulated into the record by the parties, the petitioners take the position that the correct amounts of their net worth, exclusive of a reserve for losses of $48,800, after proper accounting procedures and other applications are accorded petitioners' affairs, were as follows on the indicated dates: January 1
1943
$450,575.14
1944
462,095.41
1945
467,393.44
1946
477,404.61
1947
485,933.85
1948
480,635.76
1949
470,741.02
December 31
1949
463,379.39 Accordingly, the petitioners contend that they did not, during the taxable years 1943 through 1949, omit from their income tax returns net income in the respective amounts of $13,322.24, $22,694.85, $73,073.82, $74,604.18, $36,512.29, $55,112.03, and $28,374.97, or any part thereof, which the respondent had arrived at in the manner disclosed in Schedule A. Exhibit GZ was submitted in evidence herein for the purpose of showing that on June 26, 1952, Raymond had submitted it to Chassis *165 and Montz. The record also shows that on the foregoing date it was the subject of a conference between Raymond, on the one hand, and Chassis and Montz, on the other. While some of the items and amounts shown in Exhibit GZ appear in the net worth statement comprising Schedule A, there is no showing that their appearance in the latter was based merely upon their appearance in Exhibit GZ as such, rather than on respondent's independent investigation and determination subsequent to its receipt. Exhibit GZ was not admitted into the record as proof of the correctness of its contents and we do not find that petitioners otherwise have established the correctness of such contents. From an overall consideration of the entire record bearing on the instant issue and various other related contentions of the petitioners, including those relating to the net worth of petitioners on the pertinent dates involved and those relating to the existence of and the amounts of petitioners' cash on hand on various dates, we are of the opinion and so hold that the increased income per net worth of petitioners for the respective taxable years as set forth in Schedule A is fair, reasonable, and substantially *166 correct and is to be sustained. Accordingly the respondent's motion for an increased deficiency in tax for 1945 will be granted to the extent of the increase shown by the recomputation of the tax for that year under Rule 50. Issue 5. Liability of Petitioners for 1943 Through 1949 for Additions to Tax for Fraud Under Section 293(b) of the Code The petitioners bring their main brief to a close by concluding that there is no deficiency in tax and no addition to tax for any of the years in issue. Immediately preceding the statement of their conclusion the petitioners again turn to Exhibit GZ heretofore considered in the preceding issue. From that exhibit the petitioners present the following tabulation: Excess of assets over recorded lia-
bilities (net worth) on the opening
date, January 1, 1943
$450,575.14
Plus reserve for losses
48,800.00
Total net worth
$499,375.14
Net worth on December 31, 1949
$463,379.39
Decrease in net worth in 7 years
$ 35,995.75 The following comment is subsequently made: "Where there is no increase in net worth, as in this case, there can be no deficiency." Since the record fails to show that the petitioners have established *167 the correctness of the contents of Exhibit GZ, we obviously are unable to accept as correct the statements made in the above tabulation and the above-stated conclusion that there is no deficiency in tax and addition to tax for any of the years in issue. The petitioners also take the position: (1) that they made and filed their income tax returns for the taxable years in issue in good faith in full belief that the returns were, as filed, true and complete and were not false in any particular, nor were any facts stated therein or omitted therefrom for the purpose of fraud with intent to evade tax, and (2) that for the taxable years in issue the petitioners tried to comply with the provisions of the applicable Code and with the regulations of respondent. As was set out in the preceding issue, the petitioners, like every other taxpayer, were required by law to file an income tax return for each of the taxable years involved herein and to report thereon fully and honestly every item of gross income received by them and inherent in that requirement was the further requirement that they maintain adequate records of some kind to show to them and to the respondent the amount of income received *168 by them in each year and the nature and basis for any deductions claimed in their returns. The record discloses that Raymond prepared or caused to be prepared the income tax returns for the respective years in issue. At the times of such preparation Raymond was an accountant with 21 or more years' experience, 11 or more of which were as a certified public accountant. During his experience in such prior years he also had engaged actively and broadly in Federal income tax practice. As a result of his practice and experience and, as shown herein, as a result of his study of matters pertaining to Federal income taxation, we are of the opinion that it is fair and reasonable to conclude that he was fully informed as to the requirements of the law respecting the filing of income tax returns and the proper maintenance of adequate books and records relating thereto. Against such a background of experience, knowledge, ability, and skill we are presented herein with a record that is replete with a showing of omissions of items of income from interest, dividends, rental receipts, proceeds of sales, partnership receipts, and capital gains, on the one hand, and a showing of deductions taken for *169 excessive and duplicate depreciation, duplicate deduction for casualty loss, and nonallowable deductions for dependdents, on the other hand. In addition we are faced with a showing of the absence and inadequacy of records and an atempt by Raymond to procure the destruction or misappropriation of bank records in order to conceal from respondent information relating to Raymond's transactions with a customer of the bank. The following is a statement of the amounts of income of petitioners determined by respondent by the net worth method which were not reported by petitioners on their income tax returns for the respective years: Amount of
income determined
Year
by net worth method
1943
$13,322.24
1944
22,694.85
1945
73,073.82
1946
$74,604.18
1947
36,512.29
1948
55,112.03
1949
28,374.97
In the light of the record presented as to the instant issue we think it must have been apparent to petitioners that the returns for the years in issue were not "true, correct, and complete" returns for such years, that they were not made in good faith, and that in making and filing them, the petitioners had not seriously attempted to comply with the pertinent provisions *170 of the applicable Code and the regulations of the respondent. Section 293(b) of the Code provides as set out below. [4]
On this issue the respondent has the burden of proof. An affirmative willful attempt to defeat and evade income tax may be inferred from conduct such as the destruction of books or records, concealment of assets, or covering up sources of income, handling one's affairs to avoid making the records usual in transactions of the kind of such affairs, and any conduct, the likely effect of which would be to mislead or to conceal. Spies v. United States, 317 U.S. 492 (1943). In considering proof of a pattern of *171 omitted income with regard to the issue of willfulness, the Supreme Court in Holland v. United States, 348 U.S. 121 (1954) stated: A final element necessary for conviction is willfulness. The petitioners contend that willfulness "involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income." This is a fair statement of the rule. Here, however, there was evidence of a consistent pattern of underreporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records. Since, on proper submission, the jury could have found that these acts supported an inference of willfulness, their verdict must stand. * * * From the entire record we conclude that the testimony of Raymond O'Connor is entitled to be given but little, if any, weight. The record discloses statements by him to the effect that it is not necessary in an income tax return to disclose the full amount of gross income and allowable deductions in order to arrive at net taxable income; that all that is required is to disclose the excess of gross income over deductions; that books *172 and records are adequate under the law if the taxpayer himself (not the respondent), by the use of his own memory, is sufficiently reminded by such records as are kept so that he himself (not respondent) can compute his taxable income. In some instances he has admitted the nonreporting of income, the double deduction of expense, and the taking of depreciation deductions beyond the stated life of an asset. These statements and actions alone are incredible when viewed in the light of his long experience as a public accountant, a certified public accountant, and his representation of clients in this Court. We are convinced too that the entire record of Raymond's business and family affairs, such as his stated gifts of income and property to his minor children, his offhand and cavalier transfer of income and property from one corporation owned or controlled by him to another or himself, and his deliberate attempt to conceal bank records from respondent, disclose a readiness on his part to depart from the truth when to do so is to his supposed advantage. It is also apparent to us that he has consistently, at least during the years at issue, deliberately confused his financial affairs for *173 the purpose of concealing his true income and thus evading the lawful tax thereon. From our consideration of the record bearing on this issue in connection with the above-mentioned holdings of the Supreme Court in the indicated cases, we have concluded and found as facts that the income tax returns of the petitioners for the years in issue were false and fraudulent and were made with intent to evade tax and further that part of the deficiency for each of the years is due to fraud with intent to evade tax. Accordingly we hold that the petitioners are liable for the additions to tax determined by respondent under section 293(b) of the Code with such increase for 1945 as results from a recomputation of the tax for that year under Rule 50. Issue 6. Respondent's Failure To Determine That Assesment of the Deficiencies in Income Tax for 1943 Through 1946 Is Barred Under the Provisions of Section 275(a) of the Code Issue 7. Respondent's Failure To Determine That Assessment of the Deficiencies in Income Tax for 1943 Through 1945 Is Barred Under the Provisions of Section 275(c) of the Code Section 275(a) and (c) of the Code provides as follows: SEC. 275. PERIOD OF LIMITATION UPON *174 ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *
(c) Omission From Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed. At this point it is observed that section 275 begins with the following statement: "Except as provided in section 276." By the use of the foregoing statement, the provisions of section 275(a) and (c) are made subject to the provisions of section 276 of the Code. Section 276(a) provides as follows: SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or *175 fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. The above-quoted provision of section 276(a) makes it clear that in the cases specified therein "the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time." One class of cases to which the provisions of section 276(a) is applicable is "the case of a false or fraudulent return with intent to exade tax." As set out in our findings of fact and as we subsequently referred to in our opinion as to issue 5, supra, the returns of the petitioners for the taxable years involved in the instant issues, 1943 through 1946, were false and fraudulent and made with intent to evade tax and part of the deficiency for each of the years is due to fraud with intent to evade tax. In view of the foregoing we think it is apparent that assessment of the deficiencies for 1943 through 1946 here involved is not barred under section 275(a) or (c) of the Code. The respondent's action with respect to the instant issues is sustained. Issue 8. Determination *176 by Respondent That for 1944 Through 1949 the Petitioners Were Liable Under Section 294(d)(2) of the Code for Additions to Tax for Substantial Underestimation of Estimated Tax The petitioners have assigned as error the respondent's determination that under section 294(d)(2) of the Code [5] they were liable for additions to tax for 1944 through 1949 in the following respective amounts of $801.71, $2,109.14, $6,259.94, $596.95, $986.46, and $252.12 for substantial underestimation of estimated tax. *177 The petitioners relying on the holding in Schwarzkopf v. Commissioner, 246 F. 2d 731, (C.A. 3, 1957), modifying a Memorandum Opinion of this Court take the position that section 294(d)(2) provides an exception from its provisions imposing an addition to tax for those years in which there has been a timely payment of estimated tax in an amount at least as it was on the basis of the facts shown in their returns for the preceding taxable years. While the petitioners' declarations of estimated tax for the years in issue are not in evidence, we note that respondent in computing the additions to tax under section 294(d)(2) for those years, has credited the petitioners with the payment of estimated tax shown on their returns for the preceding taxable years. Since the respondent has not made any contention on brief as to the matter, we assume that the amounts involved represent timely payments made by the petitioners for the respective years within the meaning of the section. The following is a statement of the amount of tax shown on petitioners' income tax returns as filed for the indicated taxable years and the amount shown in their declarations as their estimated tax for *178 the succeeding taxable years: Amount of tax shown
Year
on return as filed
1943
$2,527.18
1944
1,323.62
1945
1,627.86
1946
397.54
1947
None
1948
None
1949
None
Amount of tax shown in
declaration of estimated tax
1944
$6,075.00
1945
7,270.00
1946
7,200.00$61947
7,200.00
1948
7,200.00
1949
6,543.21
From the foregoing it is apparent that the amount of tax shown in the declaration of estimated tax of petitioners for each of the years in issue greatly exceeded the amount of tax shown on the returns for the respective preceding taxable years. In Herbert Schellenbarg, 31 T.C. 1269, 1279 (1959), affd. 283 F. 2d 871 (C.A. 6, 1960), this Court examined the provisions of section 294(d)(2) of the Code in connection with the holding of the Court of Appeals for the Third Circuit in the Schwarzkopf case wherein that Court said: The section [294(d)(2)] in issue provides an exception from its penalty provisions for those years in which there has been a timely payment of estimated tax in an amount at least as great as it was "on the basis of the facts shown on his return for the preceding taxable year." Petitioners *179 estimated taxes for 1948, 1949, and 1951 were $4,000, $3,000, and $4,000, respectively. Each amount was greater than the amount of tax shown on taxpayer's returns for the preceding taxable years. If, as the Commissioner contends, Congress meant to compare the estimated tax with the tax based upon the reconstructed income, it should have so provided. The penalties under Section 294(d)(2) should not have been assessed for 1948, 1949, and 1951. In the Schellenbarg case this Court agreed with the foregoing interpretation placed on section 294(d)(2) by the Court of Appeals for the Third Circuit, held that such interpretation was applicable in Schellenbarg, and held that the addition to tax under section 294(d)(2) there involved was erroneously determined by respondent. In view of the foregoing we conclude that the above-mentioned interpretation placed on section 294(d)(2) is equally applicable here and hold that the additions to tax here in issue were erroneously determined by respondent. Accordingly we deny the respondent's motion for an increase in the addition to tax under section 294(d)(2) for 1945. Burt Cold Storage, Inc. Findings of Fact Some of the facts have been stipulated *180 and are found accordingly. Burt Cold Storage, Inc., was incorporated under the laws of New York in 1923 to conduct a general cold storage, refrigeration, ice, fruit, and produce business at Burt, New York. Its storage facilities consisted of three plants with a total capacity of 250,000 bushels. Plant Nos. 1 and 2 were located at Burt, New York, and Plant No. 3 was located in Olcott, New York. By a conveyance the petitioner in September 1941 conveyed title to its real estate and storage facilities situated in Olcott, New York, to A. Charles Hayman, who, in turn, thereafter in 1941, conveyed title to the properties to Burt Packing and Warehouse, Inc., which was incorporated in New York State on November 11, 1941. In August 1941, Raymond A. O'Connor, sometimes hereinafter referred to as Raymond, became the treasurer of Burt Cold Storage, Inc., and owner of all the shares of common stock of that corporation. Thereafter and throughout 1949 he continued to be treasurer and the sole owner of such stock. On September 1, 1942, and a year or more after Raymond had become the sole owner of its stock, Burt Cold Storage, Inc., filed its Federal income tax return for the fiscal year ended *181 June 30, 1942, prepared on the accrual basis of accounting, with the collector of internal revenue 28th district, Buffalo, New York. No income tax returns were filed by or on behalf of Burt Cold Storage, Inc., for any fiscal year after June 30, 1942. Burt Cold Storage, Inc., had a number of contracts with the United States Department of Agriculture, Commodity Credit Corporation, for the storage of commodities. From the fiscal year of 1942, to and including the fiscal year ended June 30, 1949, the Department of Agriculture made payments to Burt Cold Storage, Inc., in the total sum of $300,099.53 for services rendered. The payments from the Department of Agriculture and other payments of income were deposited in checking accounts of Burt Cold Storage, Inc., at the State Bank of Newfane and the Power City Trust Company. The funds on deposit in these accounts accumulated through the years, aggregating in excess of $50,000 during a part of 1945 and on May 6, 1946, Raymond withdrew $60,000 which was eventually deposited in his special account at the Power City Trust Company. Raymond kept a complete set of books and records for Burt Cold Storage, Inc., including a ledger, journal, *182 accounts receivable and accounts payable records. These records were kept up to 1947. They were not made available during the respondent's investigation of the petitioner's income tax liabilities and the lack of their availability as explained by Raymond was that they had been thrown out or burned or "something." Burt Cold Storage, Inc., issued certain invoices to American Home Foods, Inc., in 1947, with regard to the petitioner furnishing steam to the latter. Also, the canceled checks and the checkstub book of Burt Cold Storage, Inc., show that payments were made by Burt Cold Storage, Inc., in 1948 for various purposes. On March 9, 1948, Raymond submitted a financial statement to the United States Department of Agriculture on behalf of Burt Cold Storage, Inc., which he signed under the penalties of perjury. The statement contained a recital that the information contained therein was furnished as of March 8, 1948. Raymond admitted at the hearing herein that the financial statement he submitted for the corporation was false in the following particulars that - (a) the statement he made thereon that Julian O'Connor owned 255 shares of stock in Burt Cold Storage, Inc., was false; *183 (b) the statement he made thereon that Burt Cold Storage, Inc., had $26,700 of gross income in 1946 was false; (c) the statement he made thereon that Burt Cold Storage, Inc., had $25,000 of expenses in 1946 was false; and (d) the statement he made thereon that the net profit of the corporation for 1946 was $1,400 was false. The statement further showed the corporation's total current assets and its total assets as consisting of $60,000 in cash and no liabilities. Of the $60,000 which was placed in the corporation's bank account on or about March 8, 1948, by Raymond, $20,000 was withdrawn by him within 2 weeks thereafter and, in 1949, he withdrew the remaining $40,000. At the hearing herein, Raymond conceded that the income tax return of Burt Cold Storage, Inc., for the fiscal year ended June 30, 1942, did not reflect the true amount of the sales of the corporation and that the understatement of sales was approximately $56,000. Burt Cold Storage, Inc., took a deduction of $37,090.12 on its income tax return for the fiscal year ended June 30, 1942, for bad debts charged off. When questioned by respondent's Special Agent Montz in 1951 with respect to that deduction, Raymond *184 stated, "I can't explain that. I'm not familiar enough with it." During the hearing of the instant case in 1965, Raymond professed to have personal knowledge of that deduction, but did not submit any documentary or other corroborating evidence in support of his explanation thereof at that time. The deposits made by Burt Cold Storage, Inc., for the years ended June 30, 1942, through June 30, 1949, in its accounts at the State Bank of Newfane and the Power City Trust Company were in the following total amounts for the indicated years: FYE June 30
1942
Power City
Trust Co.
$ 22,929.68
State Bank
of Newfane
23,485.42
$ 46,415.10
1943
Power City
Trust Co.
$ 76,579.84
1944
103,536.22
1945
$ 69,273.75
1946
28,961.39
1947
247.68
1948
104,403.19
1949
19,264.66
$402,266.73
Total
$448,681.83
The respondent determined that the foregoing deposits to the accounts of Burt Cold Storage, Inc., constituted income to the corporation with the exception of the following transfers: 6/30/48
R. A. O'Connor Special Account
$60,000.00
Burt Packing & Warehouse, Inc.
12,320.00
$72,320.00
6/30/49
Burt Packing & Warehouse, Inc.
$ 1,917.43
R. A. O'Connor & Company
13,685.00
15,602.43
Total
$87,922.43
*185 The following is a statement of the total deposits, total transfers, net income, reported income, and understated income of Burt Cold Storage, Inc., as determined by respondent in determining the deficiencies of the corporation for the years in issue: Total
Less total
Reported
Understated
FYE June 30
deposits
transfers
Net income
income
income
1942
$ 46,415.10
$ 46,415.10
$24,218.76
$ 22,196.34
1943
76,579.84
76,579.84
76,579.84
1944
103,536.22
103,536.22
103,536.22
1945
69,273.75
69,273.75
69,273.75
1946
28,961.39
28,961.39
28,961.39
1947
247.68
247.68
247.68
1948
104,403.19
$72,320.00
32,083.19
32,083.19
1949
19,264.66
15,602.43
3,662.23
3,662.23
Total
$448,681.83
$87,922.43
$360,759.40
$24,218.76
$336,540.64
During the following years Burt Cold Storage, Inc., made aggregate distributions to Burt Packing and Warehouse, Inc., in the indicated amounts: Year
Amount
1942
$ 30,292.80
1943
57,829.19
1944
67,358.22
1945
37,841.16
1946
62,725.18
1947
6,244.63
1948
11,460.04
1949
20,745.14
Total
$294,496.36
Of the foregoing distributions, 20 *186 percent was allocable to services rendered by Burt Packing and Warehouse, Inc., in the performance of the Government contracts involved herein and was properly deductible by petitioner as compensation for such services. Ultimate Findings of Fact As to Burt Cold Storage, Inc. The income tax return filed by Burt Cold Storage, Inc., for the fiscal year ended June 30, 1942, was false and fraudulent and was made with intent to evade tax. Part of the deficiency for that year was due to fraud with intent to evade tax. Burt Cold Storage, Inc., willfully failed to file income tax returns for each of the fiscal years ended June 30, 1943, through June 30, 1949, with intent to evade taxes for those years. Opinion Issue 1. Understatement of Gross Sales or Receipts and Overstatement of Deductions for Purchases and for Bad Debts Charged Off for the Taxable Year Ended June 30, 1942 In his determination of the deficiency in tax of the petitioner for its taxable year ended June 30, 1942, the respondent has determined that in its income tax return for that year the petitioner has: (1) understated its gross sales or receipts by $22,196.34, (2) overstated its deduction for purchases by $18,000, *187 and (3) overstated its deduction for bad debts charged off by $37,090.12. In its petition, the petitioner has assigned error as to respondent's determination with respect to each of the foregoing items. The parties have stipulated into the record Exhibit L as being the income tax return of the petitioner for the fiscal year ended June 30, 1942. The return was verified and duly filed with the collector for the 28th district of New York. The return, in answer to question No. 10 thereof, contains the statement that it was not made on the basis of cash receipts and disbursements but was made on the accrual basis or method of accounting. At the hearing herein, the petitioner, relying on testimony of Raymond to the effect that Exhibit L was made on the cash receipts and disbursements basis, that on an undisclosed date another return for the petitioner was prepared on the accrual basis, and according to the best of his knowledge was filed, placed in evidence Exhibit BCS-4, which was described by Raymond as "the insertion sheet on a revised return on the accrual basis" which bears the caption "Burt Cold Storage, Inc. Operating Statement June 30, 1942 Accrual Basis." Thereupon the petitioner *188 proceeded with the hearing on the apparent assumption that a revised return containing a copy of the foregoing "Operating Statement" had been duly filed. Obviously the "Operating Statement" does not purport to be an income tax return of the petitioner, either revised or otherwise, nor does the record herein show that petitioner filed for the year in issue any return, revised or otherwise, except Exhibit L mentioned above. Since from August 1941 and thereafter throughout 1949, the latest of the taxable years here in issue, Raymond was treasurer and owner of all of the stock of petitioner and thus as sole stockholder had the sole management and control of it, including the filing of its income tax returns, we are of the opinion that the responsibility for the contents or lack of contents of Exhibit L, which ostensibly was prepared and filed either at Raymond's direction or request, rests upon him. In view of the foregoing we proceed to a disposition of petitioner's assignments of error as to the three items here involved on the basis that Exhibit L was the only income tax return filed by petitioner for its taxable year ended June 30, 1942, and that such return was, as is stated therein, *189 prepared on the accrual basis of accounting. Respecting the item of understatement of petitioner's gross sales by $22,196.34, the petitioner reported in its income tax return sales of $24,218.76. As set out in our findings, Raymond at the hearing herein conceded that the petitioner's return did not reflect the true amount of petitioner's sales for the year and that the understatement of such sales was approximately $56,000. In view of the foregoing it is apparent that respondent's determination that petitioner's gross sales were understated by $22,196.34 is amply sustained by the record. Relative to the item of overstatement of petitioner's purchases by $18,000, petitioner reported in its income tax return as an expense item $25,688.11 designated "Purchases and Other Expenses $25,688.11." A footnote to the item reads as follows: "Memo Rent for $18,000 - included in Purchases and Other Expenses." The return did not contain any segregation or allocation of the $18,000 between "Purchases" and "Other Expenses" or contain any information upon which such segregation or allocation could properly be made. The balance sheet comprising a part of the petitioner's income tax return for the *190 taxable year in issue shows the following as part of petitioner's assets at the beginning of that year: Capital assets
(a) Depreciable assets (itemize)
Buildings
$ 60,899.79
Machinery and equipment
67,785.85
Auto and trucks
667.77
Total depreciable assets
$129,353.41
Less: Reserve for depreciation
65,554.80
$63,798.61
Land
6,900.00
Total
$70,698.61
Except for the above-mentioned "Memo Rent for $18,000," there is no indication in the petitioner's return that petitioner at any time during its taxable year ended June 30, 1942, either incurred or paid any rent on any property used by it in the conduct or operation of its business. However, at the hearing, Raymond testified that his recollection was that the $18,000 shown in petitioner's return did not represent purchases but represented a payment by petitioner of rent for the first 6 months of 1942 at the rate of $3,000 a month and was "reported as such by Burt Packing and Warehouse, Inc., in 1942." However, when asked on further examination if that $18,000 would "appear as a matter of purchases" that went into the petitioner's return for the year in issue, Raymond replied, "Well, I would have to *191 see some working papers to answer that. I can't tell 24 years afterwards what appeared in the books." Although an examination of the income tax return of Burt Packing and Warehouse, Inc., for the calendar year 1942 discloses therein, "Rental Income $36,500," there is no showing in the return or elsewhere in the record that such amount included $18,000, or any other amount as rent accrued or received from Burt Cold Storage, Inc. In view of the foregoing state of the record and in the absence of a showing that during the year in issue the petitioner was obligated to pay and did pay Burt Packing and Warehouse, Inc., or anyone else the amount of the $18,000 in controversy, the respondent's action as to that item is sustained. In its income tax return for its taxable year ended June 30, 1942, the petitioner took as a deduction "Bad Debts Charged Off $37,090.12." The pertinent provisions of section 23(a) and (k) of the Code of 1939, as amended by section 124(a) and (d) of the Revenue Act of 1942 and section 113(a) and (b) of the Revenue Act of 1943, are set out below. [6] The Code provides that a taxpayer may take deductions for bad debts under one or the other of two methods, namely, by *192 taking a deduction for debts which become worthless within the taxable year, or (in the discretion of the Commissioner) by taking a deduction for a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt as a deduction in an amount not in excess of the part charged off within the taxable year. Since *193 the deduction in issue was taken for and disallowed for bad debts charged off and was not taken for and disallowed for "a reasonable addition to a reserve for bad debts," we limit our consideration to the question of whether the $37,090.12 represented debts which became worthless within the taxable year as provided in section 23(k)(1) of the Code. When questioned in 1951 by respondent's Special Agent Montz as to the deduction of the $37,090.12 for bad debts, Raymond stated that he was unable to explain it because he was not familiar enough with it. When questioned about the deduction on direct examination at the hearing herein, he testified to the effect that he had personal knowledge of the deduction, that he endeavored to collect such accounts receivable by turning them over during an undisclosed year to a named attorney for collection, that "we got no money back; they were uncollectable except probably to pay the disbursements," and as a result the accounts were charged off as bad debts. The named attorney was not produced as a witness to corroborate any part of the foregoing testimony. Although he testified as to having personal knowledge of the deduction in issue, Raymond *194 did not state, nor does the record otherwise disclose, the year or years in which the items of indebtedness composing the amount of $37,090.12 here in issue were created. The balance sheet composing part of the petitioner's income tax return for the taxable year ended June 30, 1942, shows petitioner's notes and accounts receivable at the beginning of that year, July 1, 1941, as amounting to $37,090.12, an amount identical with that taken as a deduction in its income tax return for that year for bad debts charged off. The record is silent as to whether the notes and accounts receivable at the beginning of the year shown in its balance sheet as $37,090.12 are the same notes and accounts receivable for which the deduction of $37,090.12 was taken in the petitioner's income tax return. In the absence of evidence to the contrary we conclude that they are the same and that the indebtedness was in existence at the beginning of the petitioner's taxable year here in issue. For a finding that an indebtedness existing at the beginning of a given taxable year became worthless within the taxable year, it must be shown that it had value at the beginning of the year and that thereafter during *195 the year something occurred which rendered the indebtedness destitute of value. Denver & Rio Grande Western Railroad Co., 32 T.C. 43 (1959), affd. 279 F. 2d 368 (C.A. 10, 1960); Western Products Co., 28 T.C. 1196 (1957). For a lack of proof to show otherwise we heretofore have concluded that the indebtedness of $37,090.12 here in controversy existed at the beginning of the taxable year in issue. Such being the case and in order to prevail here, it was incumbent upon the petitioner to show that the indebtedness had value at the beginning of the year and that thereafter during the year something occurred which rendered the indebtedness destitute of value. This the petitioner has failed to do. It is true that Raymond testified to the submission of the indebtedness in some undisclosed year to an attorney for collection without productive results, but that testimony neither establishes any specific value for the indebtedness at the beginning of the year in issue, nor the occurrence during the remaining period of that year of anything which rendered the indebtedness destitute of value. The respondent's determination is sustained. Issue 2. Determination *196 of Petitioner's Net Income for the Years 1943 Through 1949 for Which Years the Petitioner Did Not File Any Income Tax Returns The parties have stipulated that from petitioner's fiscal year 1942 through June 30, 1949, the petitioner received from the Department of Agriculture the total amount of $300,099.53 for services rendered under the following contracts: Contract
Termination
Contract No.
date
date
FSC 19797
2/16/41
1/14/47
A 2PM(FW)9975
7/29/47
4/10/50
A 2PM(FW)9976
7/29/47
4/26/48
The $300,099.53 so received and other payments of income were deposited in checking accounts of petitioner at the State Bank of Newfane and Power City Trust Company. The respondent, after an examination of such accounts and an analysis of the deposits therein, determined that the deposits, with the exception of certain transfers set out in our findings, constituted income to the petitioner for the respective years as also shown in our findings. The petitioner did not file any income tax return after filing that for its fiscal year ended June 30, 1942. The respondent determined that during the years after June 30, 1942, through June 30, 1949, the petitioner continued *197 business and was liable for income tax returns for the respective years. The foregoing determinations of respondent are presumed to be correct and the burden was on petitioner to show otherwise. In view of the record herein, including the fact that the petitioner continued to receive payments from the Department of Agriculture through June 30, 1949, and including Raymond's submission to the Department of Agriculture on March 9, 1948, of a statement, signed by him under penalties of perjury, with respect to petitioner's financial condition in 1946, which though false in certain particulars, nevertheless was submitted because, in the words of Raymond, "otherwise, we couldn't get any business," and in view of the requirements of the Code of 1939 [7] as to the filing of income tax returns by a corporation, we are of the opinion that the above-mentioned determinations of respondent are correct and accordingly they are sustained. *198 The parties have stipulated that during the years 1942 through 1949 the petitioner made aggregate distributions to Burt Packing and Warehouse, Inc., in the indicated amounts set out in our findings and totaling $294,496.36. The petitioner contends that the distributions of $294,496.36 and payments made by it during the years 1947 through 1949 for wages and other expenses of Burt Packing and Warehouse, Inc., in the amount of $6,455.91, or a total of $300,952.27, were made as consideration or compensation to Burt Packing and Warehouse, Inc., for its fulfillment of Government contracts which petitioner had assigned to it. The petitioner further contends that since the foregoing amount of consideration or compensation exceeded its total receipts under the contracts, $300,099.53, by $852.74, it sustained an overall loss of the latter amount on the contracts from its fiscal year ended June 30, 1942, through June 30, 1949. The respondent takes the position that the petitioner has failed to show that the distributions made by petitioner to Burt Packing and Warehouse, Inc., during the years in issue did not constitute distributions of petitioner's profits or did not constitute loans or advances *199 made by petitioner to Burt Packing and Warehouse, Inc. At this point we will consider the apparent significance of the petitioner's use of the term "assigned" in connection with Government contracts. Raymond testified to the effect that late in 1941 the petitioner notified the Department of Agriculture that Burt Packing and Warehouse, Inc., had acquired all of the petitioner's storage facilities theretofore used by petitioner in the conduct of its business; that petitioner had assigned all of its Government contracts to that corporation; that petitioner no longer had any storage facilities to carry out any Government contracts and requested that the Department of Agriculture change its records to reflect the foregoing. In reply the Department pointed out that the contracts involved were in the name of the petitioner and were held in its name, declined to change the name of petitioner to the contract as payee thereunder and to release liability on the performance bond and insisted that payments under the contracts continue to be made to petitioner as payee as provided in the contracts. Apparently the contracts there involved were either not assignable in the usual and ordinary sense *200 or were assignable only with the consent of the Department. There is no showing that the Government contracts involved in the instant proceeding were more freely assignable that those referred to in the foregoing testimony of Raymond or that any of those here involved were assigned with the permission of the Department. From a consideration of the record bearing on the matter we are of the opinion that petitioner has failed to establish that it had any obligation to pay the amounts of the distributions made by it to Burt Packing and Warehouse, Inc., during 1942 through 1949 or that the amounts of such distributions constituted reasonable compensation to the latter corporation for services rendered by it in the performance of the Government contracts here involved. In view of the foregoing, the petitioner has failed to establish the deductibility of the amounts of such distributions. Although the petitioner has failed to establish the deductibility of the amounts of the distributions here involved, we are satisfied that during the years 1942 through 1949 Burt Packing and Warehouse, Inc., rendered services in connection with the fulfillment of the Government contracts in issue. However, *201 the record fails to provide a basis for determining with exactness the portion of the distributions properly allocable to the services rendered. Such being the situation we have applied the rule of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), and determined that 20 percent of the amounts of the distributions was applicable to the services rendered by Burt Packing and Warehouse, Inc., and was properly deductible by petitioner as compensation for such services. In connection with the instant issue the petitioner has requested that we find (1) that while the petitioner's bank accounts continued to bear petitioner's name from 1942 through June 30, 1949, the funds deposited therein belonged to Burt Packing and Warehouse, Inc., which treated and used such funds as its money, and (2) that the petitioner was dissolved by proclamation of the Secretary of State of the State of New York published December 15, 1947, that when in 1951 the respondent determined against the petitioner the deficiencies in issue, there was no such entity as petitioner, and that no tax of any kind is due from the petitioner for the years in issue. In support of the first of the foregoing requests, *202 the petitioner relies on the testimony of Raymond who testified in the tenor of the foregoing request. In so testifying, Raymond did not state or indicate the factual basis, if any, upon which he relied, and the petitioner does not point us to any facts in the record which support either his testimony or the petitioner's requested finding. On the contrary, certain of Raymond's testimony on cross-examination shows that petitioner's bank accounts were not treated or used by Burt Packing and Warehouse, Inc., as its assets in the balance sheets comprising part of the latter corporation's income tax returns. In view of the foregoing state of the record, the requested finding has not been made. Respecting the second requested finding, the applicable New York law provided as follows: Upon the dissolution of a corporation for any cause and whether voluntary or involuntary its corporate existence shall continue for the purpose of paying, satisfying and discharging any existing liabilities or obligations, collecting and distributing its assets and doing all other acts required to adjust and wind up its business and affairs, and it may sue and be sued in its corporate name. * * * [N. Y. *203 Gen. Corp. Law § 29.] Under the above-quoted provisions of New York law, the mere dissolution of a corporation does not destroy its existence but continues its existence for the purposes stated above. Giovannangeli v. Levich and Pollach, 235 N.Y.S. 28 (1929); Bloedorn v. Washington Times Co., 89 F. 2d 835 (C.A.D.C. 1937); Olean Sand & Gravel Corporation, 24 B.T.A. 324, 328 (1931). Since at the time of its dissolution in December 1947 the petitioner was a party to two Government contracts, one of which had a termination date in 1948 and the other had a termination date in 1950, and since the deficiencies determined against the petitioner were for the years 1942 through 1949, here in issue and not yet adjusted and wound up, we are of the opinion that the petitioner was in existence in 1951 when the respondent determined the deficiencies and has continued in existence at all times since. Accordingly the second requested finding has not been made. Issue 3. Respondent's Determination That for the Taxable Years Ended June 30, 1942, Through June 30, 1949, the Petitioner Was Liable for Additions to Tax Under Section 293(b) of the Code for Fraud
*204 Corporations can act only through individuals charged with the conduct of their affairs. Here, from August 1941 through June 30, 1949, Raymond owned all of the stock of the petitioner and was its treasurer. In such a situation Raymond was in sole control of petitioner and in charge of the handling of its financial matters, including those relating to its income taxes. In its income tax return for its fiscal year ended June 30, 1942, the petitioner understated sales by upwards of one-half of the amount of its total gross sales, deducted $18,000 for rent not shown to have been incurred or paid, and deducted more than $37,000 for bad debts charged off which were not shown to be deductible in that year. In our opinion the foregoing omission of sales and the taking of deductions for rent and bad debts were for the purpose of misleading the respondent and concealing from him the full, true, and correct income of the petitioner for that year. Accordingly we have found that petitioner's income tax return for such year was false and fraudulent and that part of the deficiency for that year was due to fraud with intent to evade tax. The petitioner willfully failed to file income tax returns *205 for each of its fiscal years ended June 30, 1943, through June 30, 1949, for the purpose of misleading respondent and concealing from the respondent its full, true, and correct income for such years with the intent to evade taxes for those years. In view of the foregoing the respondent's determination of additions to tax under section 293(b) for the years in issue is sustained. Issue 4. Respondent's Determination That for the Taxable Years Ended June 30, 1942, Through June 30, 1946, Petitioner Was Liable for Additions to Tax Under Section 291(a) of the Code for Failure To File Excess Profits Tax Returns Issue 5. Respondent's Determination That for the Taxable Years Ended June 30, 1943, Through June 30, 1945, Petitioner Was Liable for Additions to Tax Under Section 291(a) of the Code for Failure To File Declared Value Excess Profits Tax Returns Issue 6. Respondent's Determination That Petitioner Was Liable for Deficiencies in Income Taxes, Declared Value Income Taxes, and Excess Profits Taxes and Additions to Tax When There Has Been No Corporate Activity on the Part of Petitioner Since June 30, 1942 Pertinent provisions of section 291(a) of the Code respecting additions to *206 tax imposed by that section are set out below. [8] The provisions of that section make it clear that the addition to tax stated therein is imposed in the case of any failure to make and file return required by that chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. *207 As we understand the position of petitioner on brief, petitioner would dispose of the foregoing issues on the following bases: (1) that it owes no tax for any year, (2) that presently it is not an entity, and (3) that its legal existence ceased not later than its dissolution in December 1947. Since we have heretofore disposed of the foregoing questions adversely to the petitioner, no further discussion appears necessary. Decisions will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all references herein to the Code are to the Internal Revenue Code of 1939.↩
1. Revenue agent's report.↩
1. Revenue agent's report.↩
2. SEC. 51. INDIVIDUAL RETURNS. (b) Husband and Wife. - (1) In General. - A husband and wife may make a single return jointly. Such a return may be made even though one of the spouses has neither gross income nor deductions. If a joint return is made the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several.↩
1. Acquired by Bertha in her sole name on October 23, 1945. ↩
2. Claimed as a deduction twice on 1949 return; once on farm schedule and once as an itemized deduction.↩
3. SEC. 3631. RESTRICTIONS ON EXAMINATION OF TAXPAYERS. No taxpayer shall be subjected to unnecessary examinations or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Commissioner, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.↩
4. SEC. 292. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2)↩.
5. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. (d) Estimated Tax. - * * *
(2) Substantial Underestimate of Estimated Tax. - If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals other than farmers exercising an election under section 60(a), or 66 2/3 per centum of such tax so determined in the case of such farmers, exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter (excluding, in case the taxable year begins in 1943, any quarter beginning prior to July 1, 1943) of such year (or in the case of farmers exercising an election under section 60(a), within the last quarter) in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year (or in the case of any such farmer, or in case the fifteenth day of the third month of the taxable year occurs after July 1, on July 1 of the taxable year) but otherwise on the basis of the facts shown on his return for the preceding taxable year.↩
6. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *↩
7. SEC. 52. CORPORATION RETURNS. (a) Requirement. - Every corporation subject to taxation under this chapter shall make a return, stating specifically the items of its gross income and the deductions and credits allowed by this chapter and such other information for the purpose of carrying out the provisions of this chapter as the Commissioner, with the approval of the Secretary may by regulations prescribe. The return shall be sworn to by the president, vice president, or other principal officer and by the treasurer, assistant treasurer, or chief accounting officer. * * *↩
8. SEC. 291. FAILURE TO FILE RETURN. (a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 3612(d)(1)↩.